1                   UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

4

5     UNITED STATES         )   CR. NO. 08-10318-NG

6     VS.                   )   COURTROOM NO. 2

7     STEPHEN WATT,         )   1 COURTHOUSE WAY

8         DEFENDANT             BOSTON, MA  02210

9

10                      SENTENCING HEARING

11

12                       JUNE 8, 2009

13                        3:02 P.M.

14

15

16

17

18           BEFORE THE HONORABLE NANCY GERTNER

19          UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24               VALERIE A. O'HARA

25             OFFICIAL COURT REPORTER

APPEARANCES:

    United States Attorney's Office, by STEPHEN P. HEYMANN, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02210, for the United States;

    MICHAEL C. FARKAS, ESQ., 381 Park Avenue South, New York, New York, for the Defendant.

1                              INDEX

2  **GOVERNMENT EXHIBITS**
   **Exhibit        Description                    Identification Evidence**

3
   1A,1B, 2A,2B  Copy of e-mails                          8
4  3A,3B,3C,4A,
   4F, 5A
5
   4B, 4C       Newspaper articles                       8
6  and 4D

7  4E           Handwritten document                     8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1    THE CLERK:  All rise.  United States District
Court is now in session.

    THE COURT:  You can be seated.  Mr. Watt, would
you please stand.

        (Defendant was sworn)

    THE COURT:  Mr. Watt, have you read the
presentence report?

    THE DEFENDANT:  I have.

    THE COURT:  Are there any changes that you wish to
make other than those that your counsel has already made?

    THE DEFENDANT:  There are none.

    THE COURT:  Okay.  You can be seated.  I have a
number of questions before you do your presentations.
First, it seems that there a number of cases that are listed
in the presentence report as related cases which are
actually part of a single conspiracy, and that the
government indicted separately so that, what is it, five
Judges have pieces of an overall puzzle.  Why was that?

    MR. HEYMANN:  Your Honor, that was simply an
aspect of the absence of a related case rule in the
district.

    THE COURT:  The absence of?

    MR. HEYMANN:  A related case rule in the district.
The initial charge was an information, I forget whether it

1    was Christopher Scott, then Patrick Toey or Patrick Toey,

2    then Christopher Scott, but I was concerned about the flip

3    side of this, whether or not it was permissible or it would

4    be viewed as forum shopping to supersede an information

5    against one defendant with information against a second

6    defendant.  There then is a separate indictment brought, so

7    there is a series of -- there isn't one case, there's a

8    series of sequential events with concern on my part as to

9    whether or not it would be perceived as forum shop to start

10   with the initial information and then keep adding on.  It

11   may have been a misjudgment on my part.

12        THE COURT:  Each of these cases are conspiracy

13   cases, and I imagine in each of these cases, you'll be doing

14   what you're doing here, which is trying to hold the

15   defendant in front of the Judge accountable for the rest of

16   the amount of the conspiracy, and the problem then is if

17   that's what your sentencing strategy is going to do, is

18   going to be, probation and the Judge sees a corner of the

19   whole picture.  It doesn't get to see the whole picture.

20        MR. HEYMANN:  Well, there was an effort on the

21   government's part with respect to the statement of facts to

22   present the entire picture, and I share the Judge's concern,

23   but the question is how within this district, where there is

24   no related case, as the Court is aware, there is the civil

25   context but not the criminal context how the government is

1    to proceed when what is happening is not an initial

2    indictment and then a series of things that follow but

3    perhaps an initial information then a second information,

4    and whether or not, I've never seen a superseding

5    information bring a second defendant in.

6           Again, that may have been a misunderstanding on my

7    part as to what would be considered acceptable or not and

8    what would be considered an inappropriate tacking on to an

9    initial information, but it moved from something more narrow

10   to something much larger.

11          THE COURT:  Right.  And so having spread this out

12   across other cases, and I understand Mr. Watt is the first

13   person being sentenced of this, of all of them; is that

14   right?

15          MR. HEYMANN:  That is correct, your Honor.

16          THE COURT:  So the question of just sort of his

17   role in the overall scheme of things is a little hard to

18   grasp when all I have is a statement of reasons in this

19   case.  Probation tells me that Mr. Zaman or Zaman has pled

20   guilty and will be sentenced August 9th, but his presentence

21   report has not -- is that right, or plead guilty?

22          PROBATION OFFICER:  It's in August, your Honor.

23   I'm not sure of the exact date.

24          THE COURT:  But the presentence report has not

25   been done.

1            MR. HEYMANN:  The statement of facts was drafted

2       by me, your Honor, in order to reflect all those people who

3       were charged as of the time Mr. Watt plead, I think

4       Mr. Zaman pled guilty afterward, so his role would not be in

5       this present statement of facts.

6            THE COURT:  Do you believe Mr. Watt is the least

7       culpable of the group?

8            MR. HEYMANN:  No, your Honor.

9            THE COURT:  Why is that?

10           MR. HEYMANN:  Your Honor, if I may address this --

11           THE COURT:  In a broader?

12           MR. HEYMANN:  -- in a broader context.

13           THE COURT:  Let me then ask all of my questions,

14      one is the question of the relative culpability, the other

15      is I don't see in the papers what Mr. Watt got out of this.

16      I don't see in the papers whether he got any money.

17           MR. HEYMANN:  Let me address both of those

18      questions together, and if I may, your Honor, defense

19      counsel has seen all of these.  I'd ask that these be -- I'm

20      going to refer to them during my presentation that they be

21      marked and admitted as exhibits to this sentencing hearing.

22      My understanding is that there is no objection except as to

23      the relative weight that ought to be placed on them.

24           THE COURT:  Is there an objection?

25           MR. FARKAS:  No objection to the authenticity.

1           THE CLERK:  Exhibit A.

2           ( Copy of e-mails were marked Government's

3     Exhibits 1A and 1B, 2A and 2B, 3A, B, C, 4A, 4F and 5A and

4     entered into evidence.)

5           ( Newspaper articles from the internet were

6     marked Government's Exhibits 4B, C, D and entered into

7     evidence.)

8           ( Handwritten document was marked Government's

9     Exhibits 4E and entered into evidence.)

10          MR. HEYMANN:  For the record, your Honor, those

11    are a copy of exhibits, what have been marked Exhibits 1A

12    and 1B, 2A and 2B, 3A, B and C, 4A, B, C, D and F, and,

13    lastly, 5A, and the Court will see that there are certain

14    subsections that have been highlighted for clarity, but

15    defense counsel's copy has also been highlighted for that

16    purpose, so he has an exact copy and has had since this

17    afternoon an exact copy of everything in that folder.

18          THE COURT:  Okay.

19          MR. HEYMANN:  Shall I proceed, your Honor?

20          THE COURT:  Yes, please.  Does this come from the

21    wire tap conversations between Mr. Watt and Mr. Gonzalez?

22          MR. HEYMANN:  They were not wire tap, your Honor,

23    there are --

24          THE COURT:  E-mails, I'm sorry.

25          MR. HEYMANN:  There are three or four different

1    categories of things in there.  The first is that Albert

2    Gonzalez was unquestionably the leader of this conspiracy,

3    logged a number of his internet messenger conversations.  He

4    was using a variety of instant messenger forms of

5    communication, and he was logging some of them.

6         The computer kept track of it all.  It was not a

7    government wire tap.  Those are from one of Mr. Gonzalez's

8    computers, so when you see an exchange between, for example,

9    looking at Exhibit 2A, Supreme Team '04 was the nickname or

10   alias used by Albert Gonzalez and is recorded in his

11   communications, and MCCSucks2 was the alias used by the

12   defendant, Mr. Watt.

13        These are simply being automatically recorded in

14   2004, 2005 and 2006 by Albert Gonzalez's computer as they're

15   talking back and forth live using instant messenger or one

16   of the instant messengers.  I can't remember off the top of

17   my head which one they are using at the time.

18        There are -- you will see later on in Exhibit I

19   believe it's 4B, C and D a series of newspaper articles.

20   Those were newspaper articles which during the course of the

21   instant messenger exchanges, Albert Gonzalez sent links to

22   particular newspaper articles.  I simply printed off those

23   articles.

24        There is also a printout of one of the two

25   programs at issue written here by Mr. Watt, that's

1    Exhibit 3A, and, lastly, there is in Exhibit 1B a profile of

2    Mr. Watt taken from Albert Gonzalez, a server used by the

3    conspiracy.  The conspiracy used a server and logged on,

4    which the critical Sniffer program was stored, tens of

5    millions of credit cards were stored.  There's no contention

6    that Mr. Watt had access to the credit cards at the time,

7    but also this profile written of Mr. Watt later published in

8    Phrack Magazine, one of the online hacker magazines, and

9    this is his profile actually found in his folder on the

10   Labian server.

11           So let me first take it --

12           THE COURT:  Again you're referring to 1B?

13           MR. HEYMANN:  I'm referring now to --

14           THE COURT:  1B is the profile.

15           MR. HEYMANN:  1B, yes.  So, your Honor, if I may,

16   at the risk of being a little bit redundant for what was in

17   the presentence report, let me take a step back as to the

18   whole conspiracy, what it set out to accomplish, what the

19   defendant's role was within that conspiracy, why it was not,

20   as it were, the least culpable of them all and then take on

21   in the process, perhaps the last step, why the defendant was

22   doing what he was doing because I think that becomes very

23   clear in 1A and 1B.

24           Okay.  So the conspiracy was a conspiracy among

25   Albert Gonzalez as its leader, Mr. Watt, the defendant, as

one of its principal code writers, Christopher Scott and

Patrick Tuey, those were the ones who were on the ground

trying to hack into the machines.  Humza Zaman is somebody

who moved money from one place to another.  Those are the

ones who are charged in that, in the case.  Justin Myers is

somebody who worked with Albert Gonzalez on another hack

tangential to the central conspiracy.

What was involved was the following set of steps.

A member of the conspiracy would figure out how to hack into

a major retailer using any one of a variety of techniques.

You will see, for example, in Exhibit 2A that the defendant

is working with Albert Gonzalez to create a back door, a

hidden route into Fortune City.  They were also at the time

working to get into Bizrate.

Later on in the conspiracy, Christopher Scott

would use open wireless access points or ones that were

weakly protective to get into the company.  At the tail end

of the conspiracy, Patrick Toey would try an attack, which

is called an SQL injection attack where you try to tell a

database to do something it doesn't understand how to do

when it gets to the end of the system.

Once they were in the system, they wanted to get

credentials, passwords and user names that would allow them

to further take things from the system.  They wanted to get

credit card numbers, debit card numbers, pin numbers, and

1   it's at that stage where the defendant's role was absolutely

2   pivotable where in the instance of TJX where they were not

3   only to talk about a corporation, $180 million worth of

4   damages, but to put this in human terms, literally tens of

5   millions of people, like everybody else in this room, to

6   rely on their credit card and debit cards had their numbers

7   stolen depending on the software he wrote to pull it all out

8   of the system and then had to recreate their credit

9   references, recreate their credit history, go without for a

10  while.

11       There were tens of millions of human beings that

12  were violated that way.  That took place in a number of

13  retailers, some banks, credit card numbers taken out, debit

14  card numbers taken out, pin numbers for those debit card

15  numbers taken out.  All of that had to be given out.  As I

16  said, that's where his software was absolutely critical, and

17  his relationship with Gonzalez was absolutely critical.

18       Then that was sold over the internet to, among

19  other people, a person in the Ukraine, Maxine Yastrzemski,

20  who sold blocks of those debit card numbers.  It was given

21  to other people in the conspiracy to cash out, to use ATMs

22  to get tens of thousands of dollars and hundreds of

23  thousands of dollars at a time, then that money had to be

24  moved, that's where Mr. Zaman flies to San Francisco, picks

25  up money, we'll talk about that in a second, picks up money,

1  brings it to the east coast or ships it rather to Gonzalez,

2  and those are the various steps that are involved.

3        Now, let me, if I can, first answer the question

4  why he was doing what he was doing and then take the Court,

5  if I may, have a few more minutes take the Court in greater

6  detail through all of his, the depth of his involvement in

7  this particular conspiracy and at each stage of the

8  conspiracy.

9        What is quite disturbing about all this, is

10  precisely that he wasn't doing it for the money.  This is

11  such a huge problem because it creates a deep sense of

12  violation, of the individual whose identity is stolen.  It

13  can cause this enormous dollar damage to individual

14  companies, in this case it did at quite unprecedented levels

15  across the country to the point of putting those companies

16  at risk, and it was that --

17        THE COURT:  To the point of putting TJX and its

18  companies at risk?

19        MR. HEYMANN:  Yes.  It was that that was what

20  motivated the defendant, those kind of malicious intents.

21  He was attending, believe it or not, birthday parties that

22  cost $75,000 along with Gonzalez and a few other people.  He

23  was attending, staying in penthouses while going to music

24  festivals but all with the cash that was generated by this,

25  but the reason he was doing this, to turn you to Exhibit 1A,

1   is to quote him after we get passed the Court's language at

2   the top of it, "You know the rush you get, it's not just

3   knowledge, but it's forbidden knowledge, you know, you can

4   learn about anything under the sun and be bored to death,

5   but it's illegal.  Look, you can be small and mobile and

6   smart, just like this group, and you're ripping off somebody

7   large and powerful and dangerous.  There was a rush of being

8   a small group going after the big companies."

9        Turning to his Phrack biography, the first few

10   lines are just highlighted to link the identity to the

11   defendant here, you know it was in his folder on the Lapian

12   server, and you will see that on the second page under codes

13   that this is one of only a large series of codes that he's

14   written.

15        The reason for it is described under passion on

16   page 3.  "It's distinguished by acutely defined and

17   unparalleled sense of schadenfreude," something I candidly

18   had to look up, as the pleasure derived from the misfortunes

19   of others.  "Technology is pretty fun, too (or at least it

20   was for a while) but what really took me harder and further

21   was the exciting possibility of using computers to turn the

22   life of a particular fellow human being into a living hell,"

23   exactly what happens when identities are stolen.

24        "Publishing the male spoolz of the wicked," this

25   is just a little bit farther down on the paragraph,

"archiving the hard drives of the lame," exactly what goes

on when you go in and pull all the data of a major system's

network, and "rm'ing --" that's a reference to deleting,

"-- the weak are all the activities I find inspirational."

        Then down a little further where it begins, "Which

research have you done?"  "Writing any one of several

reliable exploits for intelligently brute-forcing complex

remote vulnerabilities, which all make me feel like a hacker

from THE MATRIX."  The reason he was doing all this was

precisely to cause the harm that identity theft on this

magnitude can cause and has caused in this particular

instance.

        His role, he had aspects in virtually every part

of the conspiracy I've described to you.  The first, you'll

see in Exhibit 2A, he was part of trying to retain, gain,

retain access to companies and then to collect the

information here.  You'll see, "Supreme Team," remember

that's Gonzalez, "I got fortunecity.com.  I need some ssh

backdoors," the way to go in and keep my presence secret,

keep coming back in without their knowing, "n loggers," ways

to capture information, then they go on to discuss what

would be the best.

        "What os's, is operating systems, "need to be

backdoored on FC," Fortune City.  This is again Mr. Watt

speaking.  "Is backdooring and ssh enough?/" that's a way of

1    connecting to a computer.  "I'd like to lock it down for

2    sure.  "SSH would be nice to BD," to back door "and Trojan

3    so I can collect username and PWs," password.

4           Again, the defendant, "How bout some sshd runtime

5    process infection?"  Then it's a very complimentary response

6    by Gonzalez, and then later on 2B, you'll see he says, "Work

7    night, test this --" I'll substitute the word "stuff" for

8    what's there.  On the box itself, "Telnet to Fortune City."

9    Defendant says, "No, no, no."

10          THE COURT:  Wait.

11          MR. HEYMANN:  I'm sorry this is on 2B.

12          THE COURT:  2B, okay.

13          MR. HEYMANN:  "I need something that if shit gets

14   logged, it doesn't really matter."  In other words, I need

15   to go someplace that if they're really keeping track of us,

16   it doesn't matter at all, they're not going to find me.  So

17   he's involved in the -- he's involved, clearly involved in

18   the going in, taking the stuff out and going in and setting

19   up the software that takes the stuff out.

20          He knows that they're selling it, and he knows

21   that, and he participates in that, and the memo to the

22   Court, which I filed earlier, I quote what is on 3A where

23   Gonzalez describes that -- does two things here, one, he

24   wants the defendant to get another hacker named typedef to

25   do some work for him.

1           If he was able to hack some euro dumps, dumps are

2    references to payment card numbers, we can make a fortune.

3    "I hacked a place and took around 30,000," that's tilda 30K

4    euro dumps, "and this last week I made $11,000 for selling

5    approximately 968 dumps."

6           Then they go on to discuss later on that a Russian

7    compatriot of theirs is working on a descracker, des being

8    the inscription that is used explicitly at the time to

9    encrypt pin numbers and was broken at the time of the

10    OfficeMax intrusion that will be talked about in a minute

11    here.

12           The defendant himself goes on in Exhibit 3B to

13    write "track parser," again, showing his full and complete

14    knowledge of why they're in there and what they're trying to

15    do.  What track parser does, and I wrote, I printed out the

16    code here, what track parser does is it takes large blocks

17    of information and divides it up into the credit card number

18    and the various other information that's on the back of a

19    credit card.

20           The information on that little magnetic strip or

21    stripe on the back of the credit card is known as Track 1

22    and Track 2 data.  It includes your name, my name, the

23    credit card number, can include the pin number, other

24    information, and you need to break it out, and in order to

25    do it, when you've got thousands and tens of thousands or in

1    this case millions of credit card numbers is you need

2    something that you can plug this huge block of data in and

3    break it out and to parse it into relevant points, and he

4    drafts that.  That's what track parser does.

5           THE COURT:  And he drafts that at the behest of

6    Gonzalez?  It's responsive to what is in 3A?

7           MR. HEYMANN:  Track parser is drafted by Watt.

8    This program is actually contained in his folder, the Z

9    folder on the Lapian drive and in a separate piece of chat

10   that is not here obtained from a different computer.

11   Gonzalez refers to the fact that it's being completed.

12          In 3C, in 3C, Gonzalez says, "By the way, did you

13   write the Luhn checker?"  Again, Luhn something I had to

14   look up, Luhn is the check stub on credit card and debit

15   card numbers.  If you multiply and add the right digits,

16   they're supposed to match up to the last digit, the days

17   before we all had to call up and say when we made a credit

18   card order over the phone, what's the number on the back

19   that says 363, they would check by seeing whether or not the

20   number as configured made sense, and the way you check was

21   you multiplied two times the first digit, two times the

22   second, and you add it all up, and it had to in some way

23   match the last digit.

24          That's a Luhn checker, so Gonzalez was asking him

25   to, and you can see, they're referring to 16 digits, 15

1    digits, the number for the credit card app., the number of

2    digits that are there.  That's the way that he wanted to

3    check it and make sure the numbers were accurate, and he

4    asked Watt to prepare that device for him.

5           The defendant knew the size of this operation, and

6    he glorified, he was glorified in the inability of people to

7    unmask it and get to the heart of it, again, going back to

8    what his intent was, what his motive was and his

9    involvement.  You'll see in Exhibit 4A, they talk about,

10   there's a conversation going on between Mr. Gonzalez and

11   Mr. Watt, and you'll see first there's an article that's

12   referred to and then down lower on the page, it says,

13   "Please read that shit.  I'm laughing right now so hard that

14   I spit all over the laptop screen."  Then Watt says,

15   "Anything in clear text, like quotes, anything in clear text

16   is encrypted.  That doesn't even make sense.  That's funny,

17   mud fight."

18          You'll see in Exhibit 4B exactly where that comes

19   from.  It comes from the fact that they have now focused on

20   the fact that large numbers of debit cards have been stolen.

21   Immediately below the quote, which is the first paragraph

22   that's highlighted, they're referring to the fact that

23   there's a debit card breach.  You'll see in a minute, the

24   OfficeMax that exposed an estimated 200,000 bank accounts to

25   criminals who not only had the magnetic stripe data but also

1    the necessary pins.

2            The 4C and 4D are also articles that Gonzalez

3    sends to the defendant describing with great pleasure what's

4    going on.  You'll see at the bottom of 4B that --

5            THE COURT:  4B or C?

6            MR. HEYMANN:  4C, I'm sorry, your Honor, that

7    OfficeMax is identified there, there were large numbers of

8    debit cards taken from there and pin numbers compromised,

9    and, again, the 200,000 figure.  Under the headline,

10   "Worldwide Wave of Debit Card Fraud," "Security Breaks Could

11   Curtail Debit Card Use" is 4D, another article along the

12   same wave.  They were dealing with each other in this stuff.

13           In 4E, you will see an IP address, as the Court is

14   aware, that's the address of a computer on the internet, and

15   that address is the successor address, it's the address to

16   the server on which the first huge block of credit cards

17   were moved from TJX.

18           That server was first given a different IP address

19   than at the time it was moved there.  During TJX it was on a

20   different IP address, but the server, the same computer

21   simply gets reassigned that particular number, and this

22   piece of paper was found in the defendant's apartment at the

23   time of search.  That's 4E.

24           THE COURT:  This piece of paper was in the

25   defendant's apartment?

1          MR. HEYMANN:  Yes.  The defendant at the time of

2    the search had computer equipment.  I'd like to be able to

3    give you the full contents of that, but a good portion of it

4    was encrypted, and notwithstanding our lawful Court Order to

5    search, we've never been able to get into the encrypted

6    portion, but this piece of paper was found in the same area.

7    And, lastly, in this section, again, emphasizing the size,

8    the knowledge, the size of which they were part, you'll see

9    in 4F, Gonzalez is struggling with the part, with the fact

10   that his money counter just broke, and he's discussing that

11   with the defendant.

12          "Can't right now, I'm trying OT manually count

13   over 340,000.  My F'n money counter just broke, 340,000, and

14   it's all in 20's.  ROFL," that's the internet slang for

15   rolling on the floor with laughter.  Rolling on the floor

16   with laughter, rolling on the floor with laughter, okay.  So

17   they're discussing he knows the magnitude of this, this is

18   $340,000 in $20 bills that his compatriot has just gotten,

19   and he's worried about the fact that he can't count it

20   all.

21          Moving lastly, so we've seen him both design the

22   critical software, there is no issue about the fact that the

23   Sniffer program, the Sniffer program that was smack in the

24   middle of TJX that captured the cards as they were being

25   processed.  Anyone in this courtroom, you, I, defense

1    counsel would go to Marshals, run their credit card through,

2    it would go a Framingham processor, and there the software

3    written by the defendant would pick it up as it was being

4    processed, put it into a file, and those files were kept

5    secret, shipped to the server address, the server, the same

6    one located at that IP address on that sheet of paper and

7    eventually collect it for sale or use.

8            But that part, writing the back door for Fortune

9    City, writing the effort to get passwords and credentials

10   from Fortune City, writing the Sniffer program that captures

11   in TJX, writing the parser that allows the people to go

12   through these thousand amounts of credit cards and break out

13   the numbers, doing the Luhn checker, that was his own role.

14           He also introduced people, introduced critical

15   people to Gonzalez necessary to get the job done, get work

16   done, and participated in the money laundering itself, and

17   there you will see in what is now I should first state that

18   Gonzalez himself has stated that Watt also assisted in

19   shipping him money.

20           You will see in Exhibit 5A that two things are

21   happening.  The first is that Gonzalez has been introduced

22   to both typeset, and the Court asked about Mr. Zaman.  Humza

23   Zaman confided in the Defendant Watt because he needs these

24   people to do different things for him, so he's introducing

25   brining a number of people into this conspiracy that are

necessary.  Zaman has just gone to California and picked up

that $340,000 in cash that we just heard about, but Gonzalez

is worried about him.

Gonzalez is worried about him because he's off, as

defense counsel has conceded, there's a lot of drugs being

used by these guys, a drug net, and you see up at the top,

"How did Zaman burn $10,000?"  "Buying drugs."  It's written

here as 10K.  "Buying drugs, bottles and other random shit.

LOL.  I'm holding a brick of cash for him right now."

Gonzalez:  "LOL," lots of laughs.  "How much does he have

left?"  Watt:  "20.  I'm holding half."  First Gonzalez goes

on in this one to say, "I appreciate the connection you're

throwing my way like typedef and this Italian dude."

So what is bringing in other conspirators

necessary for Gonzalez here?  But he also says but he's also

defending the money laundering, he's also defending the guy

who physically carried the cash from San Francisco who he's

introduced, the $340,000, then on the second page, "But

listen to me, I can vouch for Humza more than anybody, I

trust him more than anybody else in the world.  He is only a

danger to himself.  He watches out for both of us."  Well,

then Gonzalez says, "Well, I know if I didn't trust him, I

wouldn't have sent him to SF," San Francisco.

THE COURT:  Gonzalez is picking up the money or

working with Zaman?

1          MR. HEYMANN:  I'm sorry, Zaman, money is sent from

2     Eastern Europe to somebody in California, Zaman's sole role,

3     and he is a lesser player in this than the defendant, is to

4     fly out to San Francisco, meet somebody, be handed this cash

5     and get it shipped back to Gonzalez.  He's been introduced

6     to Gonzalez by Watt.  Watt is protecting him, protecting his

7     role and in lesser amounts, as I understand it, Watt is

8     sending money back himself to Gonzalez because they have to

9     get money back from New York.

10          So, to go back to your question, how does his role

11    fit in, there is no question, and the government would not

12    have charged him with simply conspiracy, were it the case,

13    there is no question that he is not the leader of this

14    group, and the government does not contend that he's in the

15    role for the most part of doing the hack, getting into the

16    server, but he is on a very serious plane because he is the

17    one who is critical to getting the information out and

18    helping Gonzalez get the credit card numbers out, the debit

19    card numbers out in the tens of millions, and lest there be

20    an issue as to whether this is purely a random act or an odd

21    act, the records that I've just walked the Court through

22    show him doing it with other companies as well, shows him

23    facilitating money laundering, show him creating other forms

24    of software necessary for this group, and over a period that

25    runs from 2004 into the beginning of 2008, over a protracted

1    period, and as I indicated just drawing full circle, while

2    they were partying big in the way that they do if you feel

3    like you're powerful and successful in New York, that wasn't

4    the purpose.  The purpose was malicious as reflected in what

5    are Exhibits 1A, 1B.

6         THE COURT: He had a job all during this period of

7    time, a good job; is that right?

8         MR. HEYMANN:  It changes over time, but he does,

9    you know, in the later parts of this have a well-paying job

10   at the same time.  The government's not contending that this

11   is a person that is evil to his friends, a friend betrayer,

12   a wife beater, you know, there are two different parts of

13   what's going on here.

14        There is his attitude towards the rest of the

15   world and towards being elite within the hacking world and

16   then how he's treating -- he and Gonzalez are devoted

17   friends of each other.  I have no reason to question the

18   devoted nature of his relationship with his wife or how he

19   was at his office, but that does not minimize what he was

20   doing outside of that.

21        THE COURT:  Okay.  Thank you.  Counsel.

22        MR. FARKAS:  Thank you, your Honor.  Your Honor,

23   the government just spent 15 minutes convincing you that

24   Stephen Watt was assisting in the very hacking of these

25   systems of getting in and taking the reigns, and if it

1     strikes you as perhaps a bit disingenuous and maybe a bit

2     inconsistent to then say at the conclusion of their argument

3     that he was not the leader or doing the hack, only

4     responsible for getting the numbers out I think speaks

5     volumes about what perhaps is an overzealous attempt to

6     grossly overstate this case.

7           THE COURT:  I actually understood it differently.

8     I understood that what Mr. Heymann was saying was, I had

9     been interested in the question of why.  What I do depends

10    upon why the person did it, depends in part on retribution

11    but also depends on why, and so of significance to me that

12    he had done this without any money, without getting any

13    money in return, and what I understood Mr. Heymann to be

14    saying, which was perfectly appropriate, which is to say,

15    no, he wasn't the top of the order, there were people who

16    were more culpable, he wasn't getting money for it, but he

17    was thoroughly enjoying and maliciously engaging in the

18    piece of the pie that he had.  I don't see this at all,

19    those two positions as inconsistent.

20          MR. FARKAS:  Well, your Honor, what I take

21    exception to is that we've had a statement of facts from the

22    beginning, we've had evidence from the beginning.  We've had

23    a memorandum consistent with all that, and now today for the

24    first time, I'm hearing that Mr. Watt was responsible for

25    assisting in the actual intrusion into data systems,

1    something that he did not do, he did not plead guilty to,

2    and he was not alleged to do, including money laundering,

3    including assisting with other technical aspects other than

4    the Sniffer program, including sweeping statements without

5    basis in fact such as he wrote the Track 2 data parser.

6    That's not the fact that we stipulated to.

7         THE COURT:  How about if you focus on the facts

8    you that stipulated to and focus on that, and if you focus

9    on that, then the facts that you stipulated to, the question

10   then becomes, you know, it is a bit of a deterrence.  You

11   can make an argument that Mr. Watt is deterred from doing

12   this again, there's a general deterrence issue, which is to

13   say someone who takes such glee for no apparent monetary

14   reward, glee in undermining these systems and undermining

15   the identity of some of these people, takes this glee,

16   regardless of all the things Mr. Heymann talked about or

17   just even the piece that he stipulated to, this was, I don't

18   mean, this is an incredible sociopathic almost, this is

19   taking glee in the disrupture of systems and individuals'

20   lives.  Is that true and how do you sentence such an

21   individual?

22        MR. FARKAS:  We take great exception to that, we

23   disagree with it heartily, we believe that the leaps that

24   Mr. Heymann has made today does not support that.

25        THE COURT:  Tell me your version of it.

1          MR. FARKAS:  Please.  Mr. Watt coded programs for

2     Albert Gonzalez, his best friend, someone that he met in

3     high school in days when he was quite an introvert, someone

4     who didn't have many friends, someone who spent a lot of

5     time in books and educating himself, learning computer

6     programming on his own, someone of an extraordinary

7     intellect who was very introverted and separated in great

8     part from society.

9          I understand the idea that this creates a

10    sociopath, but quite the contrary, he was someone who

11    engaged in sports, someone who tried to better himself, and

12    someone who found himself not unlike many youngsters who

13    have consistent interests and intellect, as he does,

14    becoming enraptured by hacking and the technical challenges

15    that that imposed, and what has happened here is that

16    Mr. Heymann is trying to explain that looking at his frat

17    profile, whatever you call, which I'll talk about in a

18    minute, something that is so grossly exaggerated and driven

19    with sarcasm and falsity that it's really a shame that it's

20    even before you.

21          We'll talk about that in a moment, Judge.  To then

22    make Mr. Watt's motivation here to be simply malicious to

23    hurt people is a non sequitur because all you have to do is

24    get to know him a little bit from my writings and through

25    what I'm about to tell you, even through this profile which

1    really can't be relied upon for much, but you learn that

2    breaking into large corporate servers, causing wide spread

3    public mischief, shutting them down, stealing identities,

4    corporate victim fraud is the antiphrasis of what he has

5    ever done, even at the height of his "hacking days" when he

6    was in high school and then early in college.

7         What this person did, and it's admitted, I'm not

8    trying to hide it from you, Judge, is he was a computer

9    vulnerability specialist.  He enjoyed hacking.  It gave him

10   a thrill.  He was excited by it, both by the challenge and

11   the rush, but it was always directed towards other members

12   of the hacker and computer security scene, so to speak,

13   never wrote any programs or committed any acts with regard

14   to corporate victims, never stole anything, never stole

15   identities.

16        THE COURT:  I don't understand what you're saying.

17        MR. FARKAS:  What I'm saying is --

18        THE COURT:  Wait, let me ask you the question.  If

19   he enjoyed the hacking and he enjoyed the hacking knowing

20   that it was the TJX computer system, how can you not

21   conclude that part of the enjoyment was the enjoyment of

22   knowing that he had disrupted that institution?

23        MR. FARKAS:  I'm very glad that you asked that

24   because the evidence here is very clear that he did not know

25   anything about TJX or David Busters or OfficeMax or any of

1    the big box retailers that are charged in this case,

2    absolutely nothing.

3            In fact, if you read these hundreds of pages of

4    chat, and you certainly can't deny that he was engaging in

5    these technical problems with Albert Gonzalez about Fortune

6    City and BizRate and engaging in these technical challenges

7    that he enjoyed, and let me be clear about that, he did.

8    Not only is no mention made of TJX or any of the other

9    retailers involved in this case, but it actually is very

10   clear that they were specifically avoided in these

11   conversations.

12           THE COURT:  What about the articles that were

13   attached?  Do the articles convey to him if those guys were

14   doing that, the impression that we're doing the same thing?

15           MR. FARKAS:  I'm very glad you asked that because

16   on one occasion, the first article was sent by itself and

17   the context was Albert saying to Stephen, hey, check this

18   out, isn't this funny, not look what we're doing, not, hey,

19   check out how successful we are.  I need you to actually

20   read this, Judge, because Mr. Heymann has characterized it

21   as look what we're doing.

22           THE COURT:  You can count on it that I have.

23           MR. FARKAS:  Well, let me read it again.  Maybe

24   I'm wrong.

25           THE COURT:  It's 4A.

1          MR. FARKAS:  "You know what I find hilarious?"

2          THE COURT:  Which one are you reading?

3          MR. FARKAS:  This is 4A.

4          THE COURT:  No, 4A is the -- I'm sorry, the

5    actual, okay, go on.

6          MR. FARKAS:  Albert says, "You know what I find

7    hilarious?"  Then he provides the link, and he says this,

8    "Nice."  "Except it's longer."  "Condom for a cigarette," I

9    don't quite know what that means.  "I'll read that later."

10   Watt says, "I'm actually rushing here," which, by the way,

11   your Honor, is prevalent throughout these 300 pages, Albert

12   consistently pushing him and Watt obviously being busy,

13   taking a lot of time, frustrating Albert, that's in the

14   government's memorandum, they concede this fact.

15          "I shouldn't be talking to you right now," meaning

16   because he was rushing, rushing to go asleep.  Watt explains

17   he's doing a party tonight at Marquee.  He was doing party

18   promoting as well as working, and, of course, Albert then

19   explains how it's hilarious to watch the banking industry

20   scramble.  Schadenfreude, taking glee in that misfortune is

21   what Albert is expressing.  There is no expression this is

22   his handiwork, Judge.

23          Now, the government wants to conclude that, but

24   that is not an expression of his handiwork, not that I see.

25   I understand there's a circumstantial argument here, but

1    when you couple the fact that their efforts with BizRate and

2    Fortune City, all the other things that had nothing to do

3    with the big box retailers in this case with the fact that

4    this case was never mentioned to him and in fact avoided in

5    every conversation between them.

6         THE COURT:  What do you mean this case was never

7    mentioned to him, TJX?

8         MR. FARKAS:  TJX, let's just say TJX to include

9    the broad range of retailers involved so I don't have to

10   keep saying that.  TJX was not only never mentioned but the

11   subject was avoided, and after I go through the forensic

12   evidence with you, Judge, you're going to realize that the

13   government has absolutely no indication whatsoever that

14   Stephen Watt knew that TJX and the others were involved

15   here, none, so Watt is admittedly engaging in the

16   intellectual pursuit and challenge of these other retailers.

17   They fail.  All the while, while these chats are going on,

18   Albert has already intruded upon TJX, he's already been in

19   it and taken out information.

20        How can that be explained?  It's because he didn't

21   know about TJX and the other big box retailers, and I submit

22   to you the reason is because this is not what he does, and

23   Albert knows it, and Albert is his best friend, and my

24   submission, Judge, my argument is that Albert shielded him

25   from that knowing that this is not something that he would

1    be involved with.  He's never caused millions or even

2    hundreds of thousands of dollars of damage to anybody.  He's

3    never caused damage to hundreds or tens or thousands of

4    victims.  That's not what he does.

5            THE COURT:  Let's back off.  Again, in the portion

6    of the record referred to in the government's memo on page

7    6, it says, "Gonzalez reports that he hacked a place and

8    took $30,000 euro dumps, and this last week I made 11K from

9    only selling 968 dumps."  Watt says, "Whoa," not are you

10   actually doing that?  You shouldn't be doing that.  I can't

11   imagine you'd be doing that, and then, "People want dumps

12   from all these places.  How do you get to the place,

13   targeting," and there's a description here which is

14   inconsistent with not knowing what Gonzalez was doing, not

15   necessarily about TJX in particular but knowing that

16   Gonzalez was stealing credit card information.

17           MR. FARKAS:  We have no dispute that he knew.

18           THE COURT:  So if that's the case, then I'm

19   mystified by your argument because if it is I know the man

20   was using the information I was giving him for these dumps,

21   I know the man was stealing credit card cards from people, I

22   know the man was disrupting networks and I thought it was

23   fun, what's the difference between that and I know about

24   TJX?

25           MR. FARKAS:  First of all, dumps are a completely

1     different thing, Judge, because Sniffer programs, data

2     traveling over networks has nothing to do with dumps.  Now,

3     I understand this sounds like a meaningless distinction.

4          THE COURT:  Yes, it does.

5          MR. FARKAS:  But when we delve into Stephen a

6     little bit more and he makes his remarks, you'll understand

7     that he didn't get, he didn't under the consequences of what

8     he was doing, he felt that if he assisted someone else with

9     stealing and all he did was provide the simple means to do

10    it, that he didn't think that was a big deal, and he's

11    wrong, and that's why he pleaded guilty, that's why he's

12    responsible, that's why he's here, Judge.

13         We are not going to deny that he didn't know that

14    Albert was stealing money, but in a departure sense or in a

15    guideline sense, the legal argument I've made is that there

16    isn't a foreseeable number that we can pin down with certain

17    exceptions that I can now explain to you, but the dumps are

18    an excellent example, he told me he made $11,000 on dumps,

19    which is him hacking into a system and taking hard data off

20    of the system.

21         That's not caching data over a network.  He has

22    never hacked into a system as far as the government is

23    concerned in this case.  He did not assist.

24         THE COURT:  Is there a meaningful distinction

25    between the two in terms of you wind up at the end of the

1    day getting information which goes on a computer that is not

2    yours?  Is there a meaningful difference between the dumps

3    issue and the Sniffer program?

4            MR. FARKAS:  With regard to how wrong it is, no,

5    there is no distinction; with regard to the extent and the

6    sheer enormity of the TJX intrusion, there is a big

7    distinction.

8            THE COURT:  And that distinction is?

9            MR. FARKAS:  The distinction is under this

10   parameter of dumps, which he knew very well they were

11   taking, the harm that he could foresee, putting aside for

12   the moment, of course, he didn't appreciate the consequences

13   and he didn't appreciate the moral depravity of it, the harm

14   that he could foresee is greatly and vastly different.

15           THE COURT:  Because that is a more limited harm

16   than using the Sniffer program to just getting a continuous

17   flow of information?

18           MR. FARKAS:  From under hundreds of millions of

19   people, yes, it's a vast difference.

20           THE COURT:  What conceivable good use could there

21   be to a Sniffer program in the hands of someone like

22   Gonzalez?

23           MR. FARKAS:  Well, you qualified your question,

24   Judge, because there are good uses for a Sniffer, but in the

25   hands of Mr. Gonzalez, I'm not arguing that he provided it

1    to him so it could be put to good use.  He provided it to

2    him knowing he was going to use it for a purpose, an illegal

3    purpose, to steal.  That's why he pleaded guilty, Judge.

4           Now, my argument on this point is not only his

5    lack of appreciation for the consequences of his actions but

6    the reasons why he didn't appreciate it because the program

7    that he provided, and we didn't hear anything about this

8    from Mr. Heymann, and we haven't heard anything about this

9    in the memo in rebuttal or today in rebuttal to what I

10   wrote, and that is the program he provided was so incredibly

11   simple, so elementary that to him, he said, "How could

12   anybody get in trouble for giving him this?"  It's if

13   someone told him to use Microsoft itself.

14          Now, obviously to you and me, that's ludicrous.

15   To him, it was meaningful, and, again, it doesn't mean he

16   didn't know what he was doing was wrong, it doesn't mean

17   that he's not guilty, it doesn't mean that he's not

18   responsible and he has to pay, and certainly he has paid,

19   Judge, but it does mean that there is a subtle distinction

20   here that I must have the Court understand.  You may

21   disagree, but at least I want you to understand what the

22   context is here of Mr. Watt's activities.

23          Now, again, the government has never alleged that

24   Watt assisted in the intrusions or the hacking with regard

25   to this case, never.  The only allegation and the only plea,

1    the only overt act is that he wrote the Sniffer.  I'm not

2    going to belabor point to you, I gave you very great

3    technical detail in my memo about what this Sniffer is and

4    how anyone with any modicum of programming ability,

5    certainly not you and me, but someone with a tenth of his

6    could write in a couple of hours.  It's one of the simplest

7    of programs.

8           In fact, Mr. Heymann didn't point it out, but

9    there's a point in the log, Judge, in the chats where Albert

10   is asking him for something like that, and it's so obvious

11   by looking at it how simple it really is.

12          Now, you know, if you give a hammer to someone who

13   you know is going to kill somebody, obviously you have more

14   responsibility than just handing an otherwise undangerous is

15   not a word but in Brooklyn it is object, you follow my line

16   of reasoning?

17          THE COURT:  I'm from Queens, I follow it

18   perfectly.

19          MR. FARKAS:  Well, you follow my language then.

20   So, this is not a situation that's analogous to that, and

21   the reason why we pleaded guilty and the reason why we're

22   here is because he did it and he was wrong and, believe me,

23   he knows it.

24          THE COURT:  You know, it's interesting, I don't

25   know whether I am the only one in the building or luck of

1    the draw or what, but I actually have large numbers of cases

2    involving the internet, criminal and civil, and we begin to

3    see people, whether it's a generational issue, who are doing

4    extraordinary things to us with no idea or seemingly no idea

5    of the consequences or not caring about the consequences.

6        So it actually raises the question for sentencing

7    whether it would help for general deterrence purposes for me

8    to make certain that there are consequences so that they

9    would not be another Watt who would come forward and say I

10   didn't know that by providing this software to someone who

11   was obviously stealing that I could be responsible for

12   stealing.

13       The government's pleadings are essentially saying

14   let him and others know.  That's why the government is

15   asking for what he is asking for.

16       MR. FARKAS:  That's the reason why I included in

17   my memorandum what I think are compelling facts establishing

18   just that, that deterrence is being met simply by virtue of

19   someone who had a promising future that's now gone being a

20   convicted felon, someone who probably isn't going to be able

21   to get back on his feet in even the mid-term, let alone the

22   short term, someone who has been plunged into great debt as

23   a result, someone whose entire life has been I wouldn't say

24   ruined, that's a little too dramatic, but devastated is an

25   accurate word, someone of his intellect, someone who

1   realizes now what is happening.

2          There is an incredible amount of deterrence, and I

3   think coming off the subject of this case in particular in

4   general, someone of his age, especially let's remember when

5   these chats occurred, Judge, he was 21 years old, okay.

6   Someone of his age, someone of his background, someone of

7   his intellect, someone who disassociated himself from the

8   acts justifying it, rationalizing it as being I'm not the

9   one doing it, so what can happen to me?  Something that we

10  have seen, something that is very wrong but something that

11  odes not indicate he is a recidivist sitting before you.

12  I've cited those references in my memorandum.

13          I think one of the first big problems I had with

14  the recitation before you, Judge, is the use of things like

15  this Phrack profile, phrack.com profile which was written in

16  utterly, drippingly sarcastic and bombastic form as a joke

17  now being used as evidence that Stephen Watt is malicious.

18          On the one hand, we're accepting as the gospel

19  that he's coded programs that can't possibly exist, which is

20  true, he can't possibly have created them yet he brags of

21  doing it, and at the same time saying that he was a

22  300-pound acne-ridden teen who thankfully underwent an

23  emergency neuroplasty and then became saved.

24          It is a ludicrous document, and this is what we're

25  supposed to believe makes him a malicious individual who

1   just wants to cause harm to others.  That is not his hacking

2   scene.  It doesn't make what he did right, he's been

3   committing illegal intrusions for a long time, but he has

4   never hurt people like that, Judge.  He's been able --

5           THE COURT:  He's been committing illegal

6   intrusions, but he's never hurt people?

7           MR. FARKAS:  I said like this, he's never hurt

8   people like this.  He's gone after individuals --

9           THE COURT:  What has happened as a result of those

10  other illegal intrusions?

11          MR. FARKAS:  He has admittedly gone after other

12  members of the hacking community who have been braggers who

13  claim to be something that they're not when he's hacked into

14  their computers and made them look bad.  That's what really

15  excited him, and at this point now several years later, many

16  years later, now when he's now moved to New York, he's on

17  his own for the first time, it was the year '03 when he

18  graduated, which makes him 21 years old, 20 years old, which

19  makes him 20 years old.

20          He's living in New York City by himself.  He gets

21  a job working demolition for the months it takes to

22  interview to get a real job.  He's working demolition for $9

23  an hour, Judge, at the time that Albert Gonzalez and his

24  co-conspirators are running the shadow proof conspiracy and

25  making millions of dollars, and he's busting rocks, and then

1   he gets a job at Morgan Stanley doing something that has

2   nothing to do with computer network security vulnerabilities

3   but designing financial systems, programming financial

4   systems, and that is where his career begins.

5           And he eventually years later moves up in the

6   world to a private security company with a niche in a

7   securities industry, not security industry, the securities

8   industry, the financial services industry, an industry that

9   is now foreclosed to him forever because he is a convicted

10  felon, and you know as well as I do how regulated that

11  industry is.  He's now untouchable, he's radioactive.

12          Now, while he's doing this, and as is repleat in

13  the chat logs, if you really want to read all of them, and I

14  don't think the government would disagree with at all, his

15  hacking is limited to what he's doing with his friend

16  Albert.  He's not spending hours a day writing code anymore.

17  He doesn't have the time for it, and page after page after

18  page of the logs he is being pushed by Albert.

19          THE COURT:  Your client wants to show you

20  something, I can see that.

21          MR. FARKAS:  Page after page of Albert pushing him

22  to work faster to do things for him, him obviously being

23  intellectually stimulated by the projects that Albert was

24  showing to him, not caring about the consequences, and,

25  quite frankly, doing these things because they were easy,

1    because they were helping his friend because he didn't care

2    what it meant, because it was stimulating to him and because

3    he did not have to spend hours or days on them.

4          The Luhn checker in this case is something that

5    could not be more simple than if you look at the times in

6    the exhibit, it took him I think 12 minutes to write, Judge.

7    It's a mathematical algorithm that simply sorts numbers.

8    The track parser was not, there's no evidence whatsoever

9    that he wrote that.  It was found, I think, Steve, did you

10   say it was on the server or on his computer, where was it?

11         MR. HEYMANN:  It was found, your Honor, in the Z

12   folder, which is his folder on the Lapian server used by the

13   conspiracy to store a variety of things including the TJX

14   credit card Sniffer program.

15         MR. FARKAS:  Okay.  This is very, very important.

16   This is a crucial point, Judge, because, first of all, he is

17   not the only one that had access to it, so did Albert, and

18   it makes perfect sense that Albert said to him, Hey, I need

19   help with this program, fix it for me, he would have done

20   it.  I don't know if he did, but he would have done it,

21   let's admit it.  In that folder, I want to get into

22   forensics a little bit, if you get bored with it, let me

23   know, but this I think is crucial.

24         THE COURT:  You don't understand who you're

25   talking to.  I'm not bored with the forensics, I understand

1    the computer issues, and I have read everything, okay.

2              MR. FARKAS:  That's the reason why I thought you

3    might be bored with it, because you read everything.

4              THE COURT:  No, go right ahead.

5              MR. FARKAS:  The Z directory on this Lapian server

6    was a restricted directory.  You cannot have access to the

7    rest of that server unless you had the root password.  The

8    government concedes that he did not have root access and

9    that the credit card information, the Track II data was not

10   in the Z directory.  He had no access to those areas of that

11   server.

12             THE COURT:  I think that to some degree we're

13   going around in circles, and I think that I have a decision

14   to make, and I want to hear from Mr. Watt before I make that

15   decision.  It is not clear to me that the position of the

16   government and the position of the defendant is that far

17   apart, even if the facts are, as you have described them,

18   that he didn't know that he was helping, he didn't

19   understand that helping someone steal was itself stealing,

20   that he enjoyed the hack and was not necessarily interested

21   in the theft.

22             MR. FARKAS:  Well, that's really not our position,

23   Judge.

24             THE COURT:  I understand.  I understand.  Go on.

25             MR. FARKAS:  That's not really our position

1    because we admit to all those things, but the gravity and

2    enormity of this case certainly has some bearing on his

3    level of responsibility, and if he did not perceive it to be

4    of this gravity and this enormity, then he should not be

5    held to the standard that he is.

6              THE COURT:  It really comes down to the criminal

7    defense, it comes down to for sentencing purposes, the

8    question is what do I hold him, what do I hold him

9    responsible for, not in the guideline sense, what do you

10   hold him responsible for, having in mind that he's dealing

11   with someone who's admitting to doing things that hurt

12   people and saying I essentially don't care about that, and,

13   in any event, I believe that helping someone steal is not

14   itself stealing?

15             Isn't that exactly the lesson to convey, isn't

16   that exactly the lesson to convey to him and to others like

17   him that your complicity in this is going to matter, then

18   the question is what does "matter" mean and whether what

19   you're proposing, which is essentially a probation sentence,

20   will be enough to make it clear that it matters or whether

21   the government's sentence of five years is too much to make

22   it matter and whether there is something else in between

23   that I ought to be looking at, but that is nevertheless

24   punishment so that it would be clear to everybody and clear

25   to Mr. Watt going forward that you cannot be a cog in this

1   wheel knowing that someone else is stealing, knowing that

2   you're participating in it in some measure, even if you

3   don't have a sense of the whole and even if you didn't get a

4   dime for it.

5          I'd like to hear from Mr. Watt now.  Now it's your

6   turn to speak.

7          THE DEFENDANT:  Can I have a minute to confer with

8   my lawyer?

9          THE COURT:  Yes.

10         MR. FARKAS:  Mr. Watt has a lot of statements.  We

11  parsed it down, and he wants to ask me about that.

12         THE COURT:  I'm just concerned about the time

13  here.

14         MR. FARKAS:  I understand.  We'll parse it down to

15  about five minutes.

16         THE COURT:  I don't want to push him.  I don't

17  want to put this off, but the only reason I did is 1, I was

18  concerned about the relative culpability of Mr. Watt

19  relative to the other people who have not yet pled guilty

20  and whose presentence reports are still in the middle of

21  being prepared.  On the one hand, the government says it's a

22  statement of the facts here comprised all of the various

23  levels, but what that means that I only have the

24  government's statement of where people stand relative to one

25  another and not other people.

1          I think that the questions that you're raising

2     actually are very difficult.  On the one hand, Mr. Watt is

3     someone who has a life and a future and a supportive network

4     and talents, and that argues for it doesn't take much to

5     stop someone like him because his life has been so

6     traumatically changed.

7          On the other hand, I am tremendously troubled by

8     even if the maliciousness of this is not the level that

9     Mr. Heymann is describing, it is still mightily, mightily

10    malicious and irresponsible.  Even from what you concede he

11    knew and understood, it is still extraordinarily malicious

12    and irresponsible, and the question is whether or not

13    specific deterrence and general deterrence require that I

14    say some imprisonment is required here.

15         Why don't we take a brief break because I want to

16    talk to probation now, and it may be that Mr. Watt's

17    presentation would better be done at a time when you can

18    spend more time on it, and I'll have an opportunity to look

19    at the other cases as well.  Why don't we take a brief break

20    now.

21              THE CLERK:  All rise.

22              ( A recess was taken.)

23              THE CLERK:  All rise.

24              THE COURT:  You can all be seated.  Mr. Watt, I

25    would like to put this sentencing off until June 22d at

1    3:30.  It will give you an opportunity to collect your

2    thoughts because what you say to me is terribly important.

3    Did I say June?  June 22d at 3:30.  From the government I'd

4    like to know and from probation I'd like to know more about

5    what is going on in the other cases, and you had mentioned,

6    I think, probation has a statement of facts that was in

7    draft in the Zaman case; is that right?

8           PROBATION OFFICER:  I'm not sure if I received a

9    statement of facts yet on it.

10          MR. HEYMANN:  I'm sorry, your Honor, as the cases

11   have been going along, there have been an accretion of the

12   corral reef of the statement of facts so that all would be

13   in front of the sentencing court.  The Zaman statement of

14   facts had facts as to Mr. Zaman so that we can get you.

15          THE COURT:  Okay.  Well, to some degree, it's a

16   relative judgment.  When you sentence, you sentence an

17   individual and you make a relative judgment.  As I said, I

18   also need to hear from Mr. Watt.  I'll look over the

19   forensic evidence, which as I said I completely understand,

20   and, in addition, although this is inconsistent with the

21   defense position, I'd like the defense to consider a

22   psychiatric referral.

23          It's inconsistent with the defense position, I

24   understand the defense position, but it may be that the

25   notion that one could have believed what Mr. Watt believed

1    strains credibility, let me put it that way, that is to say

2    that you believe participating in stealing is not itself

3    stealing and that somehow -- that's all I want to say about

4    that.

5            I mean, I wonder about a psychiatric evaluation.

6    It may not be that you want to do that, and I would

7    understand if you didn't given the position you're taking,

8    but it does seem to me that it might be of some help here.

9    We'll continue this to the June 22d at 3:30.  Mr. Watt, take

10   the time, whatever you need, to think about what you want to

11   say to me and understand that it will be important to hear

12   from you.  We'll continue it until June 22d at 3:30.

13           THE CLERK:  All rise.

14           (Whereupon, the hearing was suspended at

15   3:30 p.m.)

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS     )

5    CITY OF BOSTON                )

6            I, Valerie A. O'Hara, Registered Professional

7    Reporter, do hereby certify that the foregoing transcript

8    was recorded by me stenographically at the time and place

9    aforesaid in No. 08-10318-NG, United States vs. Stephen Watt

10   and thereafter by me reduced to typewriting and is a true

11   and accurate record of the proceedings.

12                         /S/ VALERIE A. O'HARA
                           _____
13                         VALERIE A. O'HARA

14                         REGISTERED PROFESSIONAL REPORTER

15

16

17

18

19

20

21

22

23

24

25