UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES ) CR. NO. 08-10318-NG

VS. ) COURTROOM NO. 2

STEPHEN WATT, ) 1 COURTHOUSE WAY

    DEFENDANT           BOSTON, MA 02210


SENTENCING

DECEMBER 22, 2009

3:21 P.M.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S :

2         United States Attorney's Office, by STEPHEN P. HEYMANN,
     ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite
3    9200, Boston, Massachusetts  02210, for the United States;

4         MICHAEL C. FARKAS, ESQ., 381 Park Avenue South,
     New York, New York, for the Defendant.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  United States District Court is now in session.

THE COURT:  Good afternoon, everyone.  You can be seated.  I'm not sure how much of the formalities of sentencing we had accomplished the last time, so let's start from the beginning.  Mr. Watt, could you please stand.

(Defendant was sworn)

THE COURT:  Are there any changes that you want to make to the presentence report other than the changes that your lawyer has already made?

THE DEFENDANT:  No.

THE COURT:  Okay.  This is a very, very, very difficult sentencing.  I have read everything, and I have some questions in a number of different areas just as soon as I dig out here.  One minor question, in terms of pretrial, there was no issue with Mr. Watt at pretrial, was there?

PROBATION OFFICER:  Ultimately, no, there was no issue.

THE COURT:  Ultimately no issue, okay.

MR. FARKAS:  Your Honor.

THE COURT:  Yes.

MR. FARKAS:  On the issue of pretrial, may I be heard for a moment?

1          THE COURT:  Yes.

2          MR. FARKAS:  I just want to put on the record that

3    I've had a conversation with Carlos Ramirez, he's the

4    pretrial service officer supervising Mr. Watt in New York.

5    He is on vacation, and he called me from his cell to ask me

6    to represent to you he's the one who's been directly

7    supervising Mr. Watt and that he has been, "an excellent

8    subject," that he's done a "great job, tested negative at

9    all times in toxicology," reporting being complaint, and I

10   believe that Mr. Moriarty's comment about ultimately there

11   were no issues related to a question very early on as to

12   whether there was an issue with an Internet connection that

13   was active in Mr. Watt's apartment.

14         THE COURT:  Yes.

15         MR. FARKAS:  When I say we, I mean Mr. Heymann and

16   I and pretrial services as well went through this question a

17   bit, and in the end it was determined that this Internet

18   connection was for the purposes of allowing Netflix movies

19   to be delivered to the apartment.

20         THE COURT:  No, I understand, and that was

21   resolved, so that wasn't an issue.

22         MR. FARKAS:  Right.  So that is actually

23   significant because the fact that that connection stayed

24   active along with other things, which I'll mention later,

25   unless you want to hear it now, make Mr. Ramirez' report

1  significant I believe in Mr. Watt's favor.

2      THE COURT:  Okay.  Let me do this.  I want to sort

3  of just broadly scope the areas that I'm interested in and

4  then turn to Mr. Heymann for his response and then to the

5  defense for your response as well.  So this was a

6  conspiracy, the first issue in the guidelines but not just

7  in the guidelines but an issue in my sense of Mr. Watt's

8  culpability is the size of the conspiracy.

9      I'm looking not only in terms of the amounts but

10  also just broadly speaking his role in it.  The conspiracy

11  lasted from 2004 to 2007, and as the presentence report

12  discloses, it was really in full gear by March of 2007, and

13  March of 2007 is a significant date because that clearly,

14  that appears to be the date that Mr. Watt does something

15  that he acknowledges contributed to the conspiracy, which is

16  providing the Sniffer program for Gonzalez facilitating the

17  theft from TJX.

18      Before that point, however, for want of a better

19  word, stuff was going on, the conspiracy with all of its

20  participants had already -- I'm looking at the presentence

21  report -- had been dealing with Damon Patrick Toey,

22  compromise of BJ's with Christopher Scott, John James

23  becomes involved in the hacking and downloading, gains

24  access to additional retailers, OfficeMax, DSW, Sports

25  Authority, et cetera, et cetera, I'm on page 7 of the

1  presentence report, and TJX, and then it isn't until page 9,

2  so then the question is we know that in March of 2007

3  there's the sniffer program.

4       The government ties Mr. Watt to the pre-March 2007

5  activities because of his relationship with Gonzalez and

6  because of the messages that they got from Mr. Watt's

7  computer and other material, and these messages are -- I'd

8  like to understand from the government the way in which

9  these messages figured into the ongoing conspiracy bearing

10  in mind, I think that this is right, that at the time that

11  this is going on, that is to say, 2004 to March, 2007,

12  Mr. Watt has a full-time job at Morgan Stanley and by

13  February of 2007 has a full-time job at Imagine Software.

14       The rest of these co-defendants seem to be doing

15  nothing other than downloading, accessing, identity theft,

16  so in understanding both what Mr. Watt is responsible for

17  and in understanding his role, if you can show me where in

18  the -- I don't mean to -- if you're not prepared to do this

19  because I'm sort of coming out of left field a little bit

20  here, where particularly in the -- what's the basis for your

21  view that what Mr. Watt was doing prior to March of 2007 was

22  cheering on Gonzalez, knowing that he was doing illegal

23  things, talking about euro dubs, but what concretely was he

24  doing in the time other than when he's at work?

25       MR. HEYMANN:  Your Honor, if I may, there were a

1    number of steps in the Court's timeline that I think were

2    mistaken, and if I can take it through the timeline and at

3    the same time address the very questions you're asking.

4            THE COURT:  Sure.

5            MR. HEYMANN:  The timeline begins with respect to

6    the conspiracy at the end of 2003, the beginning of 2004, as

7    the Court indicated, by April of 2005, the defendant is

8    actively engaged with Gonzalez in the conspiracy.

9            THE COURT:  Why?  How do you say that?  Are you

10    saying that because of these texts?

11            MR. HEYMANN:  If I may, I'll take this one by one.

12    For this conspiracy to function, there needs to be three

13    things -- or for any attack on a computer network, you need

14    to have three things, you need to have entrance into the

15    network, you need to be able to abuse or co-op the network

16    once you're inside, then you need to in the last step take

17    advantage of what you have gained.

18            THE COURT:  Right.

19            MR. HEYMANN:  The defendant, to give a broad

20    overview, as I'll give specific examples of in just a

21    minute, was involved at times with breaking into the

22    networks, was involved at times with taking advantage of the

23    proceeds, not just talking about it but taking advantage of

24    the proceeds, but the core of his activity, the most

25    damaging core of his activity was in that center where you

1   are in the network and you are in this case victimizing

2   millions of people through downloading their credentials and

3   causing enormous amounts of damage to TJX.

4           I don't know whether the Court still has the

5   copies of the exhibits from the first proceeding.

6           THE COURT:  I do.

7           MR. HEYMANN:  But what were admitted as

8   Governments Exhibit 2A and 2B, do you have copies,

9   Mr. Farkas?

10          THE COURT:  I do.

11          MR. FARKAS:  Yes, I do.

12          MR. HEYMANN:  You'll see that he is working with

13  Gonzalez there, and there is no question that Gonzalez is

14  the leader of this organization.  He is working with

15  Gonzalez there to break into Fortune City and BizRate, two

16  other corporations' computer systems so he is in that part

17  of the conspiracy in 2005.

18          THE COURT:  Can you point this to me because I see

19  a lot of trash talk, for want of a better word, in this, and

20  I want to understand where the trash talk is, and so I see a

21  lot of trash talk in this, and then when I read the offense

22  conduct and the other materials that were given to me, it

23  appeared that Gonzalez actually had technical help from

24  other people.

25          There had been other sniffer programs, there had

been a BPN that had been set up with respect to TJX, so he was getting technical help from numbers of sources. When I originally looked at this case, I thought that Watt was sort of the sine qua non of this conspiracy, and it does appear that there's lots of other technical help.

MR. HEYMANN: What is certainly the sine qua non of the successful attack on TJX. There's never been an allegation or an assertion that he was involved, for example, in the OfficeMax break-in. That was done by others in the group with Gonzalez or with BJ's. He was, as the 2A and 2B reflect, he was working with Gonzalez on the attacks of Fortune City and BizRate, but those attacks aren't the core of the massive amounts of damages, so what is going on is Gonzalez is at the center of the conspiracy, is working with a series of people, he's working with Christopher Scott, he's working with Patrick Toey, he's working with the defendant in a variety of roles which with respect to the different attacks, they may have different roles, and they may have different elements of involvement.

There is no allegation that he was involved with OfficeMax, the top back and forth there is a sign that he knew exactly what Gonzalez was doing, he knew the size of what he was doing but not that he was involved in the actual commission of OfficeMax.

1    The talk about the sale is again a sign that he

2 knew what was being taken, he knew exactly what purpose it

3 was being taking, but there's no allegation to tie it to the

4 quote that he was involved in the taking of those particular

5 euro dumps.

6    In this case, he is involved in breaking --

7    THE COURT:  In this case, meaning TJX?

8    MR. HEYMANN:  There's no -- I'm sorry --

9    THE COURT:  When you talk, are you limiting the

10 loss because we're talking about loss, and we're talking

11 about role, limiting the loss to TJX as opposed to OfficeMax

12 and BJ's?

13    MR. HEYMANN:  This is a question that obviously

14 the Court faces constantly with conspiracies.  Either he is

15 a minor role with respect to the broader conspiracy and the

16 other losses as well, or he is a partner, an active partner

17 in TJX and TJX's loss because that's where he is active,

18 he's active there, he's active with money laundering

19 afterwards, but the big core is right there at TJX.

20    THE COURT:  Is the loss that probation identified,

21 the $400 million, or whatever the number was, is that

22 exclusively TJX?

23    MR. HEYMANN:  171.5 million, your Honor, is

24 exclusively TJX, tens of millions of people's credit and

25 debit cards each of which obviously belonged to an

individual who was victimized is exclusively TJX.  There's

additional losses, and, I apologize, but I forget the

numbers off the top of my head of roughly $10 million

associated with each of the two other entities that have

publicly reported it, but that's in the presentence

report.

So during this time when Gonzalez is working with

Toey and Scott and Watt, he is with Watt working on breaking

into BizRate and Fortune City, even as he's working with

Scott, for example, to break into OfficeMax.  It comes to

what is now June approximately of -- May approximately of

2006, and from OfficeMax, he has with the first part of what

you have to do to rape and pillage a system, he's gotten

into the system with Scott, but they've only been able --

THE COURT:  He, Gonzalez?

MR. HEYMANN:  I'm sorry, I'll stop using he,

Gonzalez has gotten into the system with Scott.  They've

come in through a vulnerable wireless access point.

THE COURT:  Right.  And they had to physically sit

outside.

MR. HEYMANN:  All they're able to do once they're

inside there is get old cards that were in storage.

THE COURT:  Payment cards.

MR. HEYMANN:  That's right, old payment cards.  I

use the term "payment cards" as a way of broadly including

1    debit cards and credit cards, you don't have to go back and

2    forth between the two.  What they needed and what the

3    defendant provided was the ability to get current cards

4    which otherwise were being stored in an encrypted form, and

5    what he does is he first creates for them and then when it

6    doesn't work at first, he fixes for them a way of harvesting

7    all of these payment cards as they're going through the

8    system at TJX, and they get shipped off to a server.

9              THE COURT:  Paragraph 16.

10             MR. HEYMANN:  I'm sorry.

11             THE COURT:  Paragraph 16 of the presentence report

12   says that in the middle of 2006 Scott installed a VPN

13   between TJX's financial transaction processing servers and a

14   server which Gonzalez obtained in California, he then

15   allowed Gonzalez and Scott to access TJX over the Internet,

16   and Scott uploads sniffer programs provided to him by

17   Gonzalez to a critical TJX payment card.

18             MR. HEYMANN:  And that sniffer program is in turn

19   provided to Gonzalez by Watt.

20             THE COURT:  By Watt.  Is that in May of 2006, or

21   everyone agrees that he doesn't get into this until March of

22   2007?

23             MR. HEYMANN:  March of --

24             THE COURT:  In fact, the next paragraph says

25   April 10th, 2006, the year preceding Watt's provision of the

1    TJX Sniffer instant messaging.  Oh, those are the chats.

2    Wait a second, but, in any event, the presentence report is

3    talking about the TJX sniffer as March of 2007.

4             MR. HEYMANN:  Yes.

5             THE COURT:  It's of significance to me because it

6    does suggest that things were well under way, putting aside

7    the message stuff, the things were under way, at least, from

8    other sources before Watt provides the Sniffer.

9             MR. HEYMANN:  There is no question that they

10   were -- that two things were under way before Watt provides

11   the sniffer.  The first is, and it's in Exhibit 4A, there's

12   a lot of money already flowing through the system from the

13   sale of earlier credit and debit cards, and the defendant,

14   Watt, has introduced Gonzalez to Humza Zaman as a way of

15   moving this cash across the country.  He is in fact shipping

16   money himself to Gonzalez, so he's involved with money

17   laundering prior to being involved in the TJX.

18            THE COURT:  What is the source of your comment

19   that he is shipping money to Gonzalez?

20            MR. HEYMANN:  We've debriefed a variety of people

21   that are involved in the organization.  There are two

22   reasons, No. 1, we've debriefed a variety of people already

23   in this case.  Candidly, your Honor, we have debriefed

24   Gonzalez, Scott, Toey, Zaman, Jethro.  We've debriefed just

25   about everybody in this.

1      THE COURT:  And they're saying that in 2000 --

2 what was the year you said?

3      MR. HEYMANN:  This would be 2006.

4      THE COURT:  2006 then Watt was --

5      MR. HEYMANN:  I'm sorry, this is early 2006 before

6 the TJX sniffer.  I want to make sure I've got the date

7 right for the Court.  Yes, this would be March of 2006.

8 This is in Exhibit 5A previously provided to the Court and

9 the defendant.

10      THE COURT:  Exhibit 5A is the chatroom.

11      MR. HEYMANN:  Where they're discussing the

12 $340,000 that Gonzalez is having a hard time counting on his

13 breaking down money counter, they're talking about

14 Humza Zaman, who is at this point a significant drug user,

15 and whether or not Watt will continue to vouch for him as a

16 money mover.  That corroborates what we have heard

17 elsewhere.

18      THE COURT:  So preteam is Gonzalez, and mccsucks2

19 is Mr. Watt?

20      MR. HEYMANN:  Yes.

21      THE COURT:  And you're getting this, "I'm holding

22 a brick of cash for him right now.  How much does he have

23 left?  I'm holding half."  He says, "I know for a fact that

24 whenever I've seen him get ready to deal with you he's been

25 very sober and alert.  He takes his dealings with you very

seriously."

MR. HEYMANN: Then on the next page, "But listen to me, I can vouch for Humza more than anybody, I trust him more than anybody in the world. He's only a danger to himself. He watches out for both of us. Well, I know if I didn't trust him, I won't have sent him to San Francisco," that's where the big clump of cash was taken and brought back to New York to be shipped down.

THE COURT: From the line that "I'm holding a brick of cash for him now," in other words, is this Watt knowing about the money dealings and the goings-on amongst others, or is this Watt participating in those deals? When you say that he was responsible for the money laundering, again, I want to understand whether he's a boyar here or he's a participant?

MR. HEYMANN: There are two things going on, and I understand the Court's confusion in that regard. With respect to this particular transcript, my understanding is he's holding payment for Zaman or money that was sent to Zaman for payment.

On other occasions, money was shipped down. We've been -- the debriefings have disclosed money was shipped down directly by the defendant to Mr. Gonzalez.

THE COURT: Where is he getting the money from?

MR. HEYMANN: There's money being taken, there's

1    money being moved.  Where is the money coming from

2    ultimately?

3            THE COURT:  Yes.

4            MR. HEYMANN:  This is the full picture of this.  I

5    can't describe in complete granularity because we don't know

6    it with complete granularity.  Money is coming, being

7    collected in a variety of forms.  No. 1, it's coming from

8    offshore being sent to people of Russian ethnic origin where

9    it's being converted into cash which in turn is being moved

10   across the country by Zaman and then sent down.

11           Some of it is being picked up in New York from

12   somebody who we haven't identified and then shipped down.

13   Some of it is being taken out of ATM machines, then being

14   shipped down, so there's a variety of sources of the cash,

15   all of which is an effort to bring it --

16           THE COURT:  But do you have Mr. Watt going -- I'm

17   not suggesting that this is required for him to be held

18   responsible, I just want to understand, doing any of the

19   things you've just described, physically wiring money, going

20   to an ATM, collecting, or is he just talking about it?

21           MR. HEYMANN:  We have been -- we were told during

22   the debriefing by his co-conspirators that, yes, he

23   personally shipped some money down to Gonzalez.

24           THE COURT:  So he's personally shipping money that

25   he never shares in?

MR. HEYMANN:  Well, you know, hearing that in the
defendant, I keep being struck by the fact that he has a
$700,000 cooperative, that he's using massive amounts of
drugs, partying regularly, all on what is a fairly modest
salary.  All of that do I have a -- can I come to the Court
and say that we've been able to locate shipments of money to
him in the same way that I've been able to locate shipments
of money to the other defendants, no, I won't represent it
to the Court.

I cannot do that, but the sort of picture here of
a person who is living way, way, way beyond his means while
being involved with somebody who is giving significant
amounts of cash that we can identify to everybody else.

THE COURT:  Do the co-defendants say that he made
any money?

MR. HEYMANN:  He's not working -- Gonzalez is
keeping each of his players fairly isolated from each of his
other players.  It's a protective mechanism, and so the
knowledge in that regard is not the -- the question of money
goes -- the question of money goes to two different things
here though.

The first is does it go to his knowledge of
everything that's going on in the conspiracy and his knowing
as he's buying into that conspiracy and assisting in it in
critical ways the whole picture?  The answer is whatever

1    else is true, that is clearly true.  He knows about the

2    break-ins, he knows about the money laundering, he knows the

3    size of this event.

4           At the first sentencing proceeding and not here,

5    the government has not argued that the principle motivation

6    of the defendant was money.  There are fundamentally, and

7    this comes through in the report of the forensic

8    psychologist, too.  There's fundamentally two things that

9    motivate vast amounts of crime, one is money, the other is

10   trying to promote self-esteem, trying to promote

11   aggrandizement, and he's driven by the second more than the

12   first.

13          THE COURT:  The reason I ask the question, you've

14   been in front of me enough times to know that I do a fair

15   amount of work before every sentencing, and the question is

16   whether or not Mr. Watt is a participant in a fraud and the

17   fraud discussion should be what's going on here, and he

18   clearly was to a degree, or whether the better analogy is

19   the hacker case, the cases of the kid who releases Pearson

20   was his name, who releases a worm that shuts down --

21          MR. HEYMANN:  Morris.

22          THE COURT:  Pardon.

23          MR. HEYMANN:  Robert Morris, now an associate

24   professor at M.I.T. by way of a criminal conviction.

25          THE COURT:  Right.  There were others who were

1  essentially doing it for the sport, bad, I mean, should go

2  to jail, but one sees different sentences with respect to

3  the malicious hackers on the one hand, sentences like a year

4  and a day, you know, Pearson, Jeffrey Lee Parson that I was

5  looking up who released the blaster worm from his house in

6  Minneapolis.

7       So the question of whether he makes money, is he

8  more like that, and then the second question is to what

9  degree, if he's in fact working 9 to 5 and more and talking

10  to Gonzalez at night and some of those conversations are

11  trash talk and some of those conversations -- to what degree

12  are those conversations helpful to Gonzalez who after all is

13  doing quite well on his own?

14       Now, the moment of helpfulness is the sniffer

15  program, there's no question about that, but that's why I

16  wanted to understand more of this.

17       MR. HEYMANN:  There were two separate questions as

18  I understood the Court.  The first is this case does not

19  fall cleanly into either the worm analogy or the virus

20  analogy or into the fraud analogy.  The clear purpose, the

21  reason it doesn't fall cleanly is that the clear purpose

22  from day one of this whole organization was to steal credit

23  card numbers, debit card numbers, to victimize the people by

24  getting money out of them.  The clear purpose is a financial

25  one.  Everybody knows it, and everybody is moving towards

1    it.

2            His role within that is, although he does get

3    involved in relatively modest ways in the money laundering

4    aspect, his principal role is as the hacker portion of it,

5    but the organization only functions if all three of these

6    components work together, if there's a break-in, the

7    stealing, the pillage of the system itself and then the

8    taking advantage, so it doesn't fall cleanly into one or the

9    other because his role is primarily one of the infiltrator

10   computer master, not the infiltrator but the computer

11   co-opter of the system but the overall purpose of the crime

12   is one of fraud from the beginning to the end.

13           THE COURT:  And your position is getting back to

14   your helpful way of describing the three steps that are

15   getting access to entrance, getting access to the computer

16   and then taking advantage of it, are those the three steps?

17           MR. HEYMANN:  Right, the first step is you got to

18   get into the network; the second is once you're in the

19   network, you've got to abuse the network in whatever way

20   you're going to abuse it, in this case, patently stealing

21   credit card information, debit card information --

22           THE COURT:  Right.

23           MR. HEYMANN:  -- other identifying information,

24   then once you get that, you have to do something with it.

25           You can count goods, I've got 42, but if you want

1    to take advantage of it, you've got to sell it, as they did

2    in Europe, or you've got to cash it out at ATMs, you've got

3    to take advantage of it in some way.  Those are the three

4    stages.

5            THE COURT:  The presentence report says, and this

6    is a critical component of the conspiracy, that Scott

7    uploaded what was Watt's sniffer program which then enabled

8    them to get unencrypted credit card transactions as they

9    traveled across TJX network.

10           MR. HEYMANN:  Yes.

11           THE COURT:  So the question is whether that's the

12   moment that brings him into this conspiracy, and then that

13   moment is March, 2007, and the question is before that is it

14   noise?

15           MR. HEYMANN:  It is his grand moment within the

16   conspiracy, it is not when he's brought into the conspiracy.

17   As the series of exhibits that were admitted earlier show,

18   he's in the conspiracy working with Gonzalez to break into

19   other places beforehand.  He's working with Gonzalez to

20   assist in movement of tens of thousands or maybe low

21   hundreds of thousands of dollars, but those are frankly

22   simply as a legal matter.

23           He's in the conspiracy by then, he's active in the

24   conspiracy by then, but the great amount of harm that he

25   knowingly and intentionally and willfully causes is when

1    he's providing the sniffer program, editing the sniffer

2    program that's in the middle of TJX, so in the conspiracy

3    beforehand, but there you have a balloon payment when he's

4    in there in TJX.

5         And just to unravel one final I think confusion

6    here, forensically we get access to the Latvian server where

7    he is working just to show that there's not all honest

8    activity going on at the office, he's going from his office

9    account at his office computer to the Latvian Server where

10   he's working on the blabla sniffer.

11        We connect him in part to the malicious software

12   through his connection from office to his connection from

13   home, he can go to work on revising that sniffer after

14   TJX.

15        I forget whether it's March, your Honor, but it's

16   in 2007, so after TJX, he's still modifying that sniffer

17   program.  It's used elsewhere, it's used in the Dave &

18   Buster's intrusion so that's where the confusion comes

19   about, March of 2007.  His creation of it though and the

20   primary utility of it is in June of 2006, if I've got the

21   right month, May of 2006, when it's used in TJX.  That's

22   where the confusion comes.

23        THE COURT:  May of 2006 it's used in TJX and in

24   the following year, he's essentially upgrading it on the

25   Latvian server?

1          MR. HEYMANN:  Yes, that's what the forensic

2     evidence discloses.

3          THE COURT:  And so before 2006?

4          MR. HEYMANN:  Upgrading it, he's working on it

5     obviously modifying it for other purposes.

6          THE COURT:  And you have evidence that some of

7     this was done from his office computer?

8          MR. HEYMANN:  Yes, the IP address information

9     links it back to his --

10          THE COURT:  Morgan Stanley or Imagine Software?

11          MR. HEYMANN:  I'm pretty sure Imagine.  I could

12     confirm with the agent.  He's at Imagine Software at that

13     point.

14          THE COURT:  Okay.  Okay.  Well, that's an

15     important point, Mr. Heymann, because then it suggests this

16     notion he's doing it in the wee hours of night when he's

17     partying, I mean, he's doing it from work?

18          MR. HEYMANN:  He's doing from work as well.

19          THE COURT:  Okay.  All right.  But you agree, do

20     you not, with probation that his role relative to that of

21     others is minor?

22          MR. HEYMANN:  Again, this goes to the question of

23     the conspiracy.  If the question is what was his role

24     vis-a-vis, TJX, then Christopher Scott breaks in through the

25     wireless.  His sniffer program is critical to capturing live

1    information.

2        THE COURT: But they had other sniffer programs.

3    The record suggests that he was not the only one.

4        MR. HEYMANN: The one that's functioning that

5    steals things, they're trying to figure out how to co-op the

6    system, the one that is functional and actually steals

7    things is his sniffer.

8        THE COURT: His, okay.

9        MR. HEYMANN: Then there's the sale of, you know,

10    the effort to sell those cards and their storage. So, with

11    respect to TJX, he's smack in the middle of this, and he's

12    smack in the middle of the group. With respect to the

13    broader conspiracy, yes, he doesn't have anything to do with

14    OfficeMax, he doesn't have anything to do with BJ's, he

15    doesn't have anything to do with DSW. As far as we know, we

16    have no evidence to give the Court that the defendant is

17    involved with, you know, these other intrusions and data

18    thefts that are reflected in the presentence report.

19        THE COURT: And looking at TJX alone, the loss is?

20        MR. HEYMANN: $171.5 billion according to their

21    SEC 2009 10 -- I always mess up the letters, I apologize,

22    your Honor, must be 10K report.

23        THE COURT: The level increased by 30 levels is

24    that it has to be more than 400 million, so you're adding to

25    that the other losses?

1          MR. HEYMANN:  That is a reflection of the fact

2     that there is a provision of the guidelines which is 2B1.1,

3     Note F, which is special rules which applies a standard

4     of --

5          THE COURT:  Oh, the access device issue.

6          MR. HEYMANN:  Which is $500 per card, and you

7     multiply it times the number of cards, and that's what

8     pushes it over, so if you're applying that note, then it's

9     $400 million above, and obviously it's the position of the

10    government that is appropriate to apply that note, but the

11    actual reported loss of TJX to date is $171.5 million.

12         THE COURT:  Access device, the access device is

13    the sniffer program or the access device is each individual

14    credit card?

15         MR. HEYMANN:  Each individual credit and debit

16    card number is by definition an access device.

17         THE COURT:  And how do you get to 400?  Do you

18    have any information as to how many credit cards were

19    involved?

20         MR. HEYMANN:  We have two sources of information

21    about how many credit and debit cards were involved.  The

22    first is that on the Ukranian and Latvian servers, there are

23    over 40 million distinct credit and debit card numbers.  It

24    would not come as a surprise to the Court, you can simply

25    run a script against it to say tell me how many unique ones

1   there are, there are a number of duplicates, there is a mild

2   overlap between the Latvian and the Ukranian server.  When

3   you separate all of the duplicates, you end up with over

4   40 million cards that are involved with this conspiracy.

5          THE COURT:  Meaning that they were there from 2004

6   to 2008?  In other words, you break into a server, how do

7   you know it came from this conspiracy rather than their

8   sources all around the world?

9          MR. HEYMANN:  We know the people who have access

10  to this, these servers, are the conspirators that are

11  charged in this case.  Gonzalez has administrative access,

12  he has access to the entirety.  The defendant has access,

13  and I want to be clear about this, the defendant has access

14  on the Latvian server to that portion where all of the

15  editing is going on in the sniffer.

16         THE COURT:  Yes.

17         MR. HEYMANN:  He does not have access to the card

18  numbers.

19         THE COURT:  I know, to the rest.

20         MR. HEYMANN:  We have no evidence of his access to

21  the Ukranian server.  The answer to the question, how do we

22  link it to this group is who has access privileges, who has

23  account privileges on the servers, and it comes back to this

24  group.  That 40 million, 41, 42 million applies to the

25  conspiracy as a whole.

1    THE COURT:  I see.

2    MR. HEYMANN:  And not uniquely to TJX.  Because of

3    the way that the sniffer program was designed by the

4    defendant, because of the way it was implemented by the

5    defendant and his co-conspirators, what was being taken was

6    stored and encrypted and shipped off, and so there is no

7    record of exactly how many cards were taken from TJX at that

8    time other than the fact that it's actively working between,

9    actively and effectively working between approximately May

10   or June, I forget which the exact date is, in 2006 through

11   December of 2006.

12        There's also again as a redundant thing with

13   respect to the conspiracy as a whole, not with respect to

14   the defendant.  They are able to tell, they know exactly how

15   many credit cards, active credit cards there were in the

16   unencrypted storage that were still valid that was taken

17   before the sniffer program gets used.  There's

18   approximately -- the active ones are about a little over 11

19   million that are still useful.  Because it's three years

20   later, there's a substantial portion that have expired by

21   then.

22        So while the reports were up to $100 million cards

23   taken during the conspiracy as a whole, we've limited our

24   number to over 40 million because the overlaps of those two

25   pieces of information.  Also, Christopher Scott tells us

1    that his recollection is that they took about 40 million

2    credit cards off of TJX.

3           That is not with an explicit differentiation

4    between the two time periods, so frankly I would be

5    extraordinarily conservative with three versions, three

6    different theftors each saying approximately 30 to 40

7    million, we simply limited it to over 40 million and didn't

8    try to parse out whether it was 60 million or 80 million

9    because of a lack of overlap because it didn't make any

10   difference.

11          THE COURT:  The only reason, it just makes the

12   guidelines, the combination, as you know, of what this loss

13   drives up the guidelines, and a statute with a five-year cap

14   makes the guidelines essentially irrelevant in this

15   analysis, it's just a very big number.  In other words, it's

16   irrelevant to this number because the guideline's life --

17          MR. HEYMANN:  Even were, your Honor, the case,

18   you've divided the sort of case into should we be looking at

19   this as a fraud under let's say a foreseeability analysis or

20   should we be looking at this as a computer hacking case?

21          Even that distinction in the context of the

22   defendant becomes frankly irrelevant given the numbers we're

23   at because under 2B1.1, Note 3, it's note 3A, III, in

24   offenses under 18 U.S.C., Section 1030, there is no

25   foreseeability requirement.

1      It's simply what is the actual loss going back to

2 our talking about the Morris work.  He didn't anticipate

3 what was going to happen, but it shut down what was in the

4 dark on that.  There's no foreseeability under it, the

5 question is what simply is the loss, so even were this

6 analysis under the guidelines purely as a hacking case, and

7 I suggest that's inappropriate, the loss figure would be

8 $171.5 million.  Under the guidelines, we would simply be

9 four levels lower, and the guideline offense level would

10 still be decades longer than the five-year cap of the

11 conspiracy here.

12      THE COURT:  Right, right.

13      MR. HEYMANN:  It is, as you say, simply a size of

14 the magnitude of the harm and the magnitude of the loss is

15 viewed from the perspective of the guidelines whether or not

16 the number ends up being 20, 30, 40 or 50 years.

17      THE COURT:  Okay.  The note that you quoted to me

18 now, the note that you quoted --

19      MR. HEYMANN:  And it's also cited by probation in

20 the presentence report in their response to one of the

21 objections by the defendant.  It's on page 43 of the report

22 on the carryover on the bottom, carryover paragraph, A, b,

23 III.

24      THE COURT:  So essentially the application note

25 trumps the usual measure of determining loss to that which

1    is foreseeable pecuniary harm, this trumps it?

2              MR. HEYMANN:  I don't believe it trumps it.  It

3    certainly -- it certainly answers the question.  I guess

4    what I'd say is it renders it moot.  There's been a great

5    deal of argument here by the defendant that the loss was not

6    foreseeable to him.  For the reasons that I've suggested to

7    the Court, the fact he's breaking into other things, if you

8    want to talk about as the trash talk, the trash talk is all

9    about this huge damage to OfficeMax, et cetera.  It is

10   complete, they're the most intimate of buddies.

11             It is completely foreseeable, but the Court

12   doesn't have to reach the question of resolving the

13   foreseeability argument necessary in terms for the other

14   application note because even were it not foreseeable, first

15   of all, if only half of it were foreseeable, we'd only go

16   down two levels, if only a quarter of it were foreseeable,

17   we'd only go down four levels.

18             THE COURT:  Right, it doesn't matter.

19             MR. HEYMANN:  The application note here says even

20   if it's wholly unforeseeable in the case of a computer

21   intrusion or hack, then he's accountable, responsible for

22   the harm that he causes having set it in motion, which he

23   did.

24             THE COURT:  The issues with respect to the other,

25   clearly the government would be looking for substantial time

1    for the other participants in this conspiracy.

2         MR. HEYMANN:  Yes, your Honor.

3         THE COURT:  In other words, what would be very

4    troubling here, and I don't think it's going to happen, is

5    if everyone higher up, as they say in the vernacular, rolls

6    on everybody else and the only person who has no one to

7    cooperate against is Mr. Watt, but at this point the others

8    are either going to be looking at substantial time or no one

9    has actually been sentenced or have gotten substantial time;

10    is that fair to say?

11         MR. HEYMANN:  Yes.  First of all, to be clear on a

12    couple things.  No. 1, everyone was given an equal

13    opportunity here.  The defendant simply chose not to.  In

14    fact, to this day, we have an encrypted computer of his and

15    a search warrant to search it and have never been given the

16    password or the opportunity to get what a Court Order

17    lawfully would give us the right to search, and there are

18    conversations intercepted with the prison system where

19    Albert Gonzalez is asking the defendant to store contact

20    information on his computer, so everybody was given an equal

21    opportunity here.

22         Everybody is going to get a substantial jail time

23    recommendation in this case.  Even though Albert Gonzalez

24    provided an extensive proffer, there is a 11(c)(1)(c) plea

25    with him that he will get no less than 15 years in jail.

1   Out of New Jersey, there's an agreement which is designed

2   somewhat differently where he is bound to recommend no less

3   than 17 years, and the government will recommend no more

4   than 25.

5          So in terms of putting the recommendation here of

6   only five years for the defendant in context, that is a

7   third or less than a third of what the leader of the group

8   will get.

9          THE COURT:  Okay.  Well, I think you understand my

10  concern.  If you want to add anything, those are my

11  questions.  That's enough.

12         MR. HEYMANN:  The question, other than needing

13  some water, the question is when the -- I would like to

14  address the Court briefly whenever the Court wants to hear

15  it about the basis for the government's recommendation

16  here.

17         THE COURT:  Why don't you do this now.

18         MR. HEYMANN:  We've just spent a good deal of

19  time, your Honor, and I hope it's clear to the Court now his

20  role in the offense, the harm that he caused and the degree

21  of his involvement.  I want to address three things though

22  that the Court raised during the last proceeding as

23  troubling the Court as the focus of the Court's interest, as

24  it was, going into sentencing, and I want to do it as it

25  were in reverse order of importance.

1          The first question, these are No. 1, the Defendant

2     Watt's moral culpability, as it were, for the offense.  The

3     second is the question of specific deterrence, addressed

4     specifically to the defendant, and the last one, the most

5     important one in this particular case of general deterrence,

6     but let me, if I can, go with those in reverse order.

7          The defendant is not somebody as many that appear

8     before this Court who has been treated shabbily by life.

9     He's had a series of, as the psychological forensic report

10    shows, been treated -- he was read to as a child, he did

11    well in school, he was sent to private school, he did well

12    going into business.

13         This is not somebody who as a result of some part

14    of their background in some way deserves special

15    consideration, who deserves special treatment.  Almost

16    everybody I would submit to the Court, as I raised earlier,

17    commits a crime either because they want money or they want

18    to get money to a friend or a family member or because they

19    simply have a strong longing, have looked powerful, have

20    greater self-esteem, look big in the community.

21         In a wonderful moment I don't know whether the

22    Court has seen it yet, the defendant through his counsel

23    after the last proceeding sends a quite dashing picture of

24    himself to Wired Magazine which is writing an article on

25    the -- which then appears about a week later as part of

writing an article about him and his involvement in this

case.

Everybody wants to either have -- they do crimes,

people do things out of panic and other things, but a big

hunk of crimes are either trying to get money for themselves

or friends or family member or try to make themselves look

big or some combination of the two.

The suggestion that is contained in the pleadings

of the defendant, suggestion that is contained in the

psychological forensic report that you should be given --

it's somehow morally excusable that you were tall, and,

therefore, had difficulty coping with life, that you grew up

with a leg brace on, and, therefore, have difficulty with

life, that you came from a particular ethnicity or religion

or color, and, therefore, had difficulty in life and,

therefore, that excuses criminal behavior is bonkers, to use

a psychological term, it simply is not morally, ethically or

legally accountable, and the guidelines, even though they're

advisory right now, clearly excluded those as

considerations.

The second thing is the need for specific

deterrence here, and specific deterrence is something that

this guy badly needs.  He was bosom buddies with

Albert Gonzalez, he knew that Albert Gonzalez had previously

been charged with an offense and was out in 2003.

He knew that he was causing harm to hundreds of thousands or millions of people. Quite striking to me as I read through the psychological forensic report is that there is not one period where he shows any concern or remorse about the harm he caused to any of those people who were victimized, to the corporation that lost more money than this entire building cost to build. There is no signs of remorse whatsoever other than the fact that it's caused him problems and it's caused his family problems.

He will end up on the street when he returns to the street with exactly the same criminal skill set, with exactly the same desire to show himself better than other people, with exactly the same lack of inhibitions caused by the harm that he has caused other people, by the fact that you can go to jail. None of that is going to deter him.

What is going to deter him is a lengthy, and even lengthy is not long under the context of this plea agreement, but a lengthy sentence that shows him that it has real cause to do this kind of crime.

It's also frankly a means of incapacitation. You saw the fact that he was doing this crime from his office as well as his home and also came back to his mother's place. The only way to stop it is by getting him off the street, and, lastly, with respect to this area of the discussion, he deals with it according to the psychological report in part

1    by distancing himself from him.  These aren't people to him.

2    This isn't a corporation to him.

3            I would discourage the Court from -- I would

4    discourage, caution, I'm not quite sure what the right word

5    is, there's an awful temptation here not to give, not to pay

6    attention to those millions of people because they're not

7    sitting here or a corporation because it's a corporation,

8    but each of those people have their identities stolen, they

9    were violated, and need, deserve to be recognized here.

10           THE COURT:  Mr. Heymann, there's a quote that you

11   should use from a law review article which I read which

12   goes, "Cyber crimes by their very nature allow offenders to

13   commit the offenses without leaving their homes and with a

14   veil of anonymity.  This lack of contact with the victims of

15   their crimes and insulation from law enforcement may cause

16   them to be undeterred.  Only successful prosecution and

17   successful punishment will supply prospective cyber

18   criminals with the information to create a real deterrence."

19   I'll give you the cite.

20           MR. HEYMANN:  I wish I had that before I wrote the

21   next section.  In the context of the quite unparallel and

22   quite -- I keep using these references to victimizing a

23   number of people that would populate a large state or this

24   building, but it's hard to get our arms around the vastness

25   of the harm that's caused here otherwise.

It's incredibly important to create a sentence
that creates a deterrent.  Here, as the Court has just
noted, there are quite literally hundreds of thousands of
people who are sitting in exactly the shoes that are reading
about what's happening here, it's one of those rare
occasions where general deterrence is not sort of just a
speculative concept, and they are sitting there behind, as
the Court, points out a terminal, the cost of committing the
crime is low, the anonymity is high, the likelihood of
capture is low.

The difficulty of tracking is extraordinarily
difficult and costly, so the risk associated with the crime
is low.  The potential damage is extraordinarily high, and
as the defendant's own cases show, simply an abstract ideal
doesn't deter him under those circumstances.

There needs to be a strong sentence here to deter
others who are trying to decide whether to cross that line
where they're sitting behind a terminal and they're
anonymous to give a real pause before they unleash whether
you want to focus on the financial nature of this attack
with millions, hundreds of millions of dollars in losses,
whether you want to focus on the individual identity theft
nature, as the Court has pointed out, there's a wide variety
of attacks that simply go at people's systems that gives
them great pause before doing so letting them know that they

1    will be held accountable in a very serious way.

2         THE COURT:  The question is whether that figure is

3    five years or whether or not for a person such as Mr. Watt,

4    and as I said, at the first sentencing here, probation, I'm

5    not considering probation, so the question is what's the

6    number here, what's the period of time where it would be

7    served that would accomplish the test that you're

8    describing.  I appreciate that.  It's not clear to me that

9    that number is five years.

10        MR. HEYMANN:  Under 3553, the Courts's attention,

11   our attention is drawn to specific deterrence, it's drawn to

12   vindication, as it were, and as I was going through those in

13   anticipation of the hearing, I was thinking, look, I'm

14   comfortable with the notion that with respect to specific

15   deterrence, five years will suffice.

16        I'm comfortable with the notion that in the

17   context of his role within the conspiracy, I don't

18   necessarily agree that five years is the right one, but his

19   role is narrow, is, you know, focused within a broader

20   conspiracy.

21        I am not comfortable with the notion that even

22   five years will provide the requisite general deterrence in

23   the case that is unquestionably of unparalled magnitude and

24   will be viewed as what happens to you if the worst that you

25   can do happens --

1       THE COURT:  Well, I understand.

2       MR. HEYMANN:  -- and not things along the way.

3       THE COURT:  That's why I looked at other

4 sentences, and the pattern here is not an unusual pattern,

5 which is a first offender who is caught either hacking into,

6 I mean, saying it's all very similar, they're all young,

7 they're all roughly Mr. Watt's age, they're all first

8 offenders, they all have prospects, they all have lives, and

9 the sentences have been lower than five years.  I wanted to

10 look at that, and it's not clear to me -- well, I think let

11 me hear from the defense.

12       MR. HEYMANN:  Yes, I'm sorry, in conclusion, I

13 too, have reviewed those.  As you go through those, the harm

14 caused in each one of those is dramatically less.

15       THE COURT:  Yes.

16       MR. HEYMANN:  I can point the Court if the Court

17 would like to see them to a variety of cases where there

18 have been intrusions, identity thefts, and the sentences

19 have ended up at eight years, nine years, in this

20 combination of situations where there is a hack plus an

21 identity theft.

22       There are a variety of ones where if the card

23 number is low, hundreds of cards or a thousand cards, the

24 person gets two or three years.  If it's more significant,

25 they're up at eight or nine years.  All of that not

1    surprisingly was taken into account at the time we were

2    prepared to enter into this agreement.

3              THE COURT:  Counsel.

4              MR. FARKAS:  Judge, I'm sure that you can

5    appreciate how extraordinarily difficult it was to sit here

6    and say nothing for the past hour, I guess.  I don't even

7    know where to start because I am again not surprisingly

8    taking extraordinary exception to most everything that

9    Mr. Heymann has said, and a percentage of that has already

10   been hashed out in my submissions and in my argument from

11   the last date, but a percentage of that is also based on the

12   fact that I am hearing things for the first time today, and

13   you are hearing things that are not in any submission, any

14   memo, any presentence report or any argument on June 8th

15   when we were here last.

16             I'm hearing today that Mr. Watt sent money to

17   people and was laundering money by sending shipments of

18   money to Mr. Gonzalez.  I'm hearing, although this was in

19   evidence at the last hearing, that this chat log, I believe

20   it's Exhibit 5A not only evidences that he introduced Humza

21   to Gonzalez and Humza was laundering money for Gonzalez but

22   that Mr. Watt's actual statement about holding cash for

23   Humza means that he was laundering money for Gonzalez,

24   too.

25             I didn't hear that last time even though this

1  exhibit was in evidence.  I'm also hearing for the first

2  time that, and, quite frankly, your Honor, I'm not making

3  any allegations or accusations, but I do not recall, and I

4  think the transcript will bear me out that at no point in

5  our last hearing was it ever indicated to the defense that

6  probation is off the table.

7          That did not happen, and, in fact, what I recall,

8  and I believe the transcript will bear me out, is that your

9  Honor's main concern, rightfully so, was the reasons why he

10  did what he did.

11          THE COURT:  No, but, Mr. Farkas, in reading

12  everything over again, that's not the position that the

13  government has made, that's my position, in reading

14  everything over again and reading about comparable cases and

15  reading every aspect of this case, that's the position I'm

16  taking.

17          MR. FARKAS:  And I understand that, your Honor,

18  and I haven't had an opportunity to speak yet, and perhaps

19  I'm hoping that I can change your mind, but I'm going to do

20  my best whether I can or can't, and the most immediate

21  example that comes to mind of comparable cases, and before I

22  even give you a concrete example, Mr. Heymann just concluded

23  by saying the other cases that I have cited in my memorandum

24  are distinct from any consideration that should be had here

25  because the harm was far less in those cases.

1    Left out of that colloquy is the fact that the

2  actions of the defendants in those cases were far more

3  direct, far more egregious and far more malicious than

4  anything that Mr. Watt did in this case.  So if we want to

5  end the discussion with what the ultimate harm is, then I

6  have nothing to say and I won't be able to convince your

7  Honor or anybody else of my position, but we've been saying

8  from the beginning that while the ultimate effect of the

9  assistance that he provided to Gonzalez cannot be

10  exaggerated, and we've never said otherwise, the nature of

11  his assistance, the very limited and simplistic nature of

12  that assistance, the minor role that the probation

13  department has attributed to him in their report, all point

14  to the fact that the imagery can be and has been greatly

15  exaggerated.

16    And your Honor touched upon a lot of the points

17  that I raise in my two memoranda and my argument on the last

18  date as to the loss, the foreseeability, the actual actions

19  he took with regard to TJX, and, again, and one of the other

20  things I've heard for the first time today is that Mr. Watt

21  completed the sniffer and provided the sniffer that was used

22  to hack into OfficeMax or Dave & Busters.

23    It doesn't matter, you can pick any one you want,

24  this is the first time we're hearing, and I don't see it

25  written anywhere, Judge, that Mr. Watt provided a sniffer

1    program to hack into other cases or other places that are

2    the subject of indictments in other jurisdictions in which

3    he is not charged.

4          We've been saying all from the beginning, from the

5    beginning that it is a dangerous rope to walk by his trying

6    to explain his actions on the one hand and not trying to

7    give you the impression that we're giving you an excuse or

8    justification.

9          We are here for a reason.  He has pleaded to a

10   felony for a reason.  He is facing a maximum of five years

11   in prison for a reason.  He has lost an extraordinarily

12   harsh amount, not just money, not just time, not just job

13   prospects but so much already before he ever steps foot into

14   a probation office or into a prison.

15         So we're not -- I'm hesitant because I don't want

16   your Honor to think we are trying to excuse his comment, and

17   this is where Mr. Heymann I think grossly misses the point

18   why the psych. exam was done and what the purpose of it

19   was.

20         So I was going to save this for a little bit, good

21   segway in reference to the psych. exam.  We agreed to do it

22   because we felt that your Honor's core concern, and we're

23   talking about practical concern, I'm not talking about

24   technical guidelines and things of that nature, but your

25   Honor's core examination rightfully why did he provide a

1    program to someone he knew was going to use it for a

2    criminal purpose?

3            Is he someone looking for money?  Is he someone in

4    the absence of looking for money must be taken I believe

5    your Honor's quote was in malicious glee in the suffering of

6    others and the enjoyment he's going to gain from watching

7    other people suffer and which would make him, I believe your

8    Honor used the word "sociopath" or something else?  Is it

9    reckless?  Is it not appreciating?  What was it?  I believe

10   that's what your Honor's concern was, as it is now, and

11   that's why you suggested perhaps a psych. report would be

12   helpful to you and now because the psych. report does not

13   show pathologies, which we never thought it would, and

14   because of the question of remorse for the victims is not

15   addressed but because the focus is on what he did because

16   Mr. Heymann argues to you that this psych. report shows he's

17   a malicious individual and he's out for those purposes that

18   entitle him to the most harsh consequences to achieve

19   specific deterrence.

20           I was hearing for the first time today somehow on

21   this modest salary he has managed to afford a $700,000

22   cooperative apartment and grand lifestyle when Mr. Heymann

23   knows well that Mr. Watt's mother paid for the apartment.

24   He didn't plop down $700,000, his mother bought him an

25   apartment, and he has a hundred thousand something job, and

he has to pay $1300 and $1600 in maintenance every month.

Your Honor, there are so many examples that surprise me today and surprise me through the pendency of the proceedings that I now want the opportunity to try to explain why your Honor has every reason to question what he did in the TJX conspiracy and where he fit in and how, although the government has not even responded to my very detailed submission in my first memorandum about the simplistic nature of the sniffer program that was consulted in this case and the elementary method and how little time it took.

This sniffer is akin to a pipe underneath your sink to the plumbing community. They have never responded to any of those submissions that I made to you or argued last time because it's true, and the government wants you to dismiss as irrelevant this simplistic nature of this assistance because it is far easier to couch his actions in terms of maliciousness when the actions themselves were so obviously egregious.

THE COURT: But why should that matter, Mr. Farkas, if you, if someone provided someone with the key to TJX, a key, pretty easy to get but it happened that he got it and that enabled them to steal 40 million cards, you know, he's responsible for the theft of 40 million cards.

The reason I was interested in what you were

1  saying was the notion it was as if there were stories here

2  and I could not figure out which story it was.  One was the

3  story of Gonzalez turning to Mr. Watt for basically

4  technical assistance, you know, schmoozing with him about

5  what Gonzalez was doing and then at this particular moment

6  Watt actually providing him with something, or was it the

7  story of Gonzalez off on a turf of his own with a lot of

8  other people making lots of money and he had this, for want

9  of a better word, trash-talking relationship with Watt every

10  night, he'd come home and he would schmooze with Gonzalez

11  where essentially the schmoozing was not essential or

12  important to the organization, and clearly at the moment

13  that the sniffer program is provided he is doing something

14  that's the equivalent of the key.  Other people may have

15  been able to get that key, maybe not a remarkable invention,

16  but he gave him the key.

17        MR. FARKAS:  I understand you now.  It's not akin

18  to a key in any way, that Mr. Watt did not know that he was

19  handing him a key or access tool or something for TJX that,

20  as Mr. Watt has conceded, Gonzalez compartmentalized his

21  conspiracy and shielded the participants from knowledge of

22  the other, and what was actually going on and that the

23  government's own forensic evidence, as it is laid out in my

24  report or in my memorandum, shows conclusively that he did

25  not know about TJX, that he not only never had even seen or

1    mentioned any of the chats we've seen but that he was

2    actually not given access to any area of the Latvian server,

3    Ukranian server, California server, any server you'd like to

4    pick that contained the stolen or other data or other

5    information as done by the conspiracy.

6          THE COURT:  But he knew that Gonzalez was hacking

7    into computers and getting --

8          MR. FARKAS:  Yes, he did, that's why we're here,

9    and that's what rolls into the question of foreseeability

10    because Mr. Watt did something criminal, he did something

11    wrong.  Based on the simplistic nature of what he did and

12    his prior experience with Gonzalez and what he had done, he

13    did it for his good friend, he liked the intellectual

14    challenge of it, and this is important, Judge, because the

15    sniffer is not designed to gather encrypted data, okay, and

16    data involving credit cards, as in the hundreds of millions

17    of credit cards that are involved in the TJX and Staples and

18    others, are encrypted types of data.

19          Mr. Watt did not do anything whatsoever despite

20    the kind of circular evidence that Mr. Heymann has made to

21    the contrary, he did nothing whatsoever to aid Gonzalez or

22    anyone else in hacking into TJX or Dave & Buster or

23    OfficeMax, it never happened.

24          When he was asked for his sniffer not for any

25    particular purpose but obviously logically so he could track

1    data in going over a network, it couldn't be for encrypted

2    data because the sniffer doesn't do it, and Mr. Heymann

3    concedes that in his submission, it says that in the

4    presentence report, it only sniffs unencrypted data over a

5    network.

6         Credit card data is not supposed to be unencrypted

7    over a network, and he has never, Mr. Watt has never

8    sniffed, stolen, used, gathered or had access to credit card

9    information over a network.

10        And, again, Judge, I'm towing the rope here

11   because I don't think I'm saying Watt did nothing wrong.  Of

12   course he did, but what was foreseeable, what he thought was

13   going to happen doesn't make it right, it's a question of

14   proportionality and percentages here by what he was able to

15   foresee was more of the same from Gonzalez.

16        Yeah, he's making money.  Yeah, he's looking for

17   log-ins, e-mails traffic that's unencrypted, instant

18   messages.  Those are the types of things that the sniffer

19   has done.  None of this has been disputed.

20        THE COURT:  They're able to obtain credit card

21   data that is unencrypted so there is the direct correlation

22   and that they got --

23        MR. FARKAS:  What's important, there's no

24   indication in the record, which is the most important thing

25   because that's what the evidence is.  We are asserting

affirmatively that there was no discussion or backup for
stealing credit card in this context or this time or TJX or
otherwise, and sniffers, as I said, sniff-encrypted
information, credit card information is encrypted, and, your
Honor, I've never submitted this because I quite frankly
never thought this was an issue.

Hey, we're bringing up things no one has heard
before, so why not, TJX suffered a great amount of damage, a
great percentage of which was as a result of them failing to
encrypt their network properly, you recall that from the 10K
or whatever it was.  The credit card information that was
sniffed from them was not supposed to be unencrypted.

Now, Judge, please don't say I'm standing there
saying it's their fault, Watt is innocent because they
didn't protect their system properly, that is not what I'm
saying.  What I'm saying, Mr. Watt when he stands through
me, he is saying providing a sniffer program for unencrypted
much by Gonzalez to steal, as he had in the past, we're not
supposed to be talking about credit card information which
is supposed to be encrypted.

THE COURT:  What would you get with that encrypted
data?

MR. FARKAS:  You would get instant messages, you'd
get e-mails, log-ins to web traffic, things that could lead
you to financial intrusions.  It's not good, Judge, okay.

1   Leif said this at the last hearing date, and I've said it,

2   you know, I've said it in here.

3        THE COURT:  Isn't that to some degree a

4   distinction without a difference?  He gave him a sniffer

5   program that enabled them to get access to information which

6   would ultimately lead them to make money rather than having

7   access to encrypted data which would have gotten to credit

8   cards.  It's a distinction without a difference.  He was

9   assisting in a fraud.

10       MR. FARKAS:  Well, I'm really speaking more a

11  technical term when we're talking about moral culpability.

12  If you help steal 10 bucks, to me, it's morally wrong about

13  stealing 100 bucks, but just on a basic moral level, it's

14  still wrong, but we have two questions to answer, what's the

15  moral level, what's the reason for why he did it, and are

16  the reasons for doing so in some way explainable or not

17  excused, of course, but in some way explainable in terms

18  other than what Mr. Heymann wants you to accept.

19       Is it that he had this great enjoyment, he needed

20  to prop himself up by hurting people, as Dr. Ebert pointed

21  out in his report, satisfied a self-indulgent need that his

22  best friend was, as he was continually pushing him to do

23  this for him, telling him how he really wanted him to do it

24  for him and it was his best friend in the world and it made

25  him great.

1          I think I've come full circle, I hope I have, this

2    is the simplistic nature of the program and the very limited

3    efforts he took, the minutes practically that it took him to

4    do this stuff enabled him to disregard his moral and

5    ethical --

6          THE COURT:  Your client wants to talk to you.

7          MR. FARKAS:  Okay.  Well, Mr. Watt wants me to

8    point out what I would have pointed out anyway, it's in my

9    notes.  Once again, we heard Mr. Heymann say today look at

10   the chat logs, you say bandying about these articles

11   bragging about what they do.  When you actually read the

12   chat logs, I said this last time, when you actually read

13   them and you see the points at which these articles were

14   IM'd to Watt on one or two occasions, Watt wasn't even

15   online, and on the one case, Hey, hey, look at this, can you

16   believe these guys?  Look, these guys don't know what

17   they're doing, not, hey --

18         THE COURT:  2A?

19         MR. FARKAS:  Yes.

20         THE COURT:  "How can we do this runtime

21   infection," then he says, "I'm going to write something to

22   do it."

23         MR. FARKAS:  Yeah, this is different from the

24   articles, Judge, this is Fortune City.

25         THE COURT:  Okay.  What he's making himself is an

1   aide of Gonzalez concretely, specifically, it's not just

2   talking about general things, he's talking about making

3   himself an aide.  This is all technical, where can I test

4   this on the box itself, then he goes on to Fortune City,

5   then it puts the sniffer program vis-a-vis TJX in a

6   different context.  It's not being provided for fun.

7          MR. FARKAS:  Well, it was never provided for fun,

8   I never argued it was provided for Albert to continue doing

9   what he's doing.  I think one of the other servers here that

10  they worked was Florida State University.

11         THE COURT:  Right.

12         MR. FARKAS:  Again, we're talking about log-ins,

13  e-mails, instant messages, we're talking about access.

14  These are not good things, Judge, but what Mr. Heymann has

15  concluded that Mr. Watt was involved in to quote his memo

16  virtually every aspect of this conspiracy and that he

17  actually helped him intrude in TJX because he went through

18  these exercises on Fortune City and BizRate, and that's not

19  accurate.  It's not fair comment.

20         It's perfectly fair to say that Mr. Watt was

21  engaging in these, in this colloquy about BizRate and

22  Fortune City, and he knows Gonzalez is involved in this type

23  of stuff, and he knows it's wrong for the intellectual.  He

24  was careless and didn't care about the consequences, but as

25  we sit here today, BizRate and Fortune City was never hacked

into.

They bear no relation to the physical hacking into of TJX.  Mr. Watt was not sitting in the parking lots with the computer systems hacking into the server of TJX, and actually there is a pager in the chat logs that's not in evidence that unfortunately mine's a little marked up, but maybe we can make a clean copy, it's page 263 of the file where we see Gonzalez asking for the sniffer and --

THE COURT:  Yes, go ahead.

MR. FARKAS:  This is what I need.  Gonzalez now says, "Let me explain, there is a box, sorry, I'm just very drunk."  This is Gonzalez speaking.  "I have access to a box (windows), and I need to make a list of IPs to that connect to a box on a certain range of ports, 26,000 to 28,000.  TCP.  I could do with net stat."  I'm leaving out a couple letters here that don't make any sense to me.  "I'm logging," then "G-R-E-P, GREP," maybe group out reports "but at different times of the day different IPs are connected.  With me so far?"  Mr. Watt replies, "Right."

So without reading the rest of the page, and I'm happy to give this to the Court, this is the example of how he would contact was say, look, this is what I need, this is the sniffer I believe and Mr. Watt believes because when you look at that port range, it's consistent with how encrypted over a network would go, and we've said Mr. Watt informs me

that later we learned through the discovery and through open source that the TJX port range, okay, so this is the done text. "Hey, I need this, here's the simplistics."

It takes up a page of chat which, let's see, it starts 0103 hours and it ends at 0122 in capital letters, "You Can Do It," okay, so it takes 20 minutes to discuss by chat and then obviously, as we've discussed so many times, I don't want to beat a dead horse, this becomes such a similar exercise for Watt, he does it, there's no hey, I'm about to steal hundreds of millions of credit cards unlike I or anybody else on this planet has done.

I'm really into this, TJX had gone on for a very long, of course, on this chat ever happened and of course doesn't show up on the chats. None of that, more of the same between Gonzalez and Watt, I need this, he doesn't, but to say that his efforts with the BizRate and Fortune City and the partying with the best friend and his answering these simplistic questions for programming that Gonzalez could have gotten and did get from any other source at any time makes him involved in virtually every aspect of this conspiracy and the key and the international world sine qua non of the Gonzalez conspiracy, at least as it regards TJX is not accurate. It's not.

It doesn't make it good, but it doesn't make it accurate, and, you know, after hearing Mr. Heymann last time

1    and this time, one has to think why do we have this plea,

2    why do we have a five-year cap, why do we have a conspiracy?

3    I mean, I shouldn't be complaining, that's what you're

4    probably thinking right now.

5         THE COURT:  That's right.

6         MR. FARKAS:  But it's not because Mr. Watt got off

7    easy and the guidelines ask for life five times over and he

8    should be happy with five years, it's not that it's because

9    everyone knew in the beginning that he had a limited role,

10   and if you look at the government's statement of offense

11   conduct that's now in the presentence report and the

12   beginning of this case and you compare it to what we heard

13   at the first hearing, this really changed.  The government's

14   position became this guy's the worst thing since slice

15   bread, he is far more involved than we say in plea

16   agreement, he's far more involved than his overt act.

17        THE COURT:  I can judge, the questions I was

18   asking I was trying to judge his involvement because what I

19   have --

20        THE COURT:  I won't certainly credit Mr. Heymann's

21   representation.  I don't think there's anything wrong with

22   them if I don't have the source of them, but even if the

23   facts are as you describe, even if this was a minor role in

24   which he was dealing, humoring, supporting someone who was

25   talking about major fraud, major identity theft, major

1    amounts of money, the question is then -- and doing it,

2    though I'm persuaded that he was not earning any money and

3    that it was really a challenge and it was part of his

4    relationship with Gonzalez, the question then is what do you

5    do to tell Mr. Watt and all the others out there candidly

6    that this is not funny, that this is malicious, that this

7    has substantial effect on people, that they may not see that

8    out there, what does it take to do that?

9           MR. FARKAS:  Questions of specific and general

10    deterrence?

11           THE COURT:  That's right.

12           MR. FARKAS:  Just as luck would have happened, I

13    happened to prepare remarks on that.

14           THE COURT:  Oh, good.

15           MR. FARKAS:  Let's talk about general deterrence

16    first, and I've already addressed this in writing without

17    beating the horses that are already dead, who is it that we

18    are seeking to deter?  We're seeking to deter people of

19    similar skill sets to either Mr. Watt or others who would be

20    capable of committing acts such as these in the future.

21           That's the nature of general deterrence, and I

22    submit to you that any person fitting that description,

23    anyone with a modicum of programming knowledge, anyone with

24    even a percentage of the skill that he has looks at this

25    case, sees his relationship with Gonzalez, sees the

elementary almost child's play nature of the actual

assistance he provided to the conspiracy, sees what happened

to him as a result and how in a moment I'll talk about the

effects on his personally, he has lost virtually everything

as a result and I would submit would be stunned, stunned

that by this level of expertise that was used in this case

and this level of assistance that was given would result in

the consequences that it already has before he steps foot in

jail for a day I think that those people would be stunned

then because this is the audience we're speaking to.

We're not speaking to people like me that are

lucky I know where the power button is on my computer, we're

talking about probably 20 something or teenagers or

something, it doesn't have to be age-limited.  Anybody who

knows how to run a program and knows how to hack and sits

down at a computer and says, uh-hum, I think I can maybe get

some credit card data or get some dumps or maybe I can hack

into a corporate retail, let's see, Stephen Watt, he created

a program in 20 minutes that I was able to make when I was

13 years old.  He didn't make any money off of it.  He had

his entire life devastated as a result.  He was unhirable in

any capacity that his career was either headed in or in many

other foreseeable ways, perhaps not hirable, he maybe may

have to change his life, I think that's deterrence.

Again, that's my submission, and I want to

1  contrast this not just to other cases where I've already

2  argued to you that the actions and the complexity of the

3  programmers' activities in those cases were far more direct

4  and complex than he was.

5          In this very case, Judge, we have a good example.

6  We have Jeremy Jethro.  We have Jeremy Jethro who we know,

7  Mr. Heymann can correct me if I'm wrong on any of this, who

8  we know was also partying with the Gonzalez crew, far bigger

9  drug problem and issues resulting from that than Mr. Watt or

10 really anybody else, the guy who was a mess who was very

11 knowledgeable about what was happening, why it was

12 happening, what companies were being attacked, how much

13 money was being made, someone who was blatantly in it and

14 motivated by money, someone who is the important part,

15 Judge, who created a program at Gonzalez' behest which took

16 weeks to months which was very, very complex and more than

17 just having such a laborious requirement was perhaps among

18 the most dangerous programs that you can make.

19          THE COURT:  Which one?

20          MR. FARKAS:  This is Jeremy Jethro the person who

21 was paid $60,000 by Gonzalez to develop a zero day export.

22 My understanding of a zero day export, the reason it's

23 called zero day, it's never been discovered before, and what

24 it does is it exploits vulnerabilities in browsers, windows,

25 and if this was deployed, this had the capability of taking

1    over millions upon millions of computers worldwide,

2    hijacking those computers and browsers and getting access to

3    every bit of personal data for every human being in their

4    houses at their computers, home, office, wherever.

5              This is the malicious, horrifying harm that

6    Mr. Heymann has been talking about that needs to be

7    deterred.  This is not what he did, and this doesn't excuse

8    what he did, but when you're talking about Jethro who gets

9    paid $60,000 who wants to be a part of this who is sitting

10   there creating a disastrous program and you're comparing it.

11             THE COURT:  And who gets paid for it and is

12   subjected to a substantial, substantial sentence; is that

13   fair to say?

14             MR. FARKAS:  He's charged with a misdemeanor,

15   Judge.

16             THE COURT:  What's the misdemeanor he's charged

17   with?

18             MR. HEYMANN:  Do you want me to address this

19   point, your Honor?

20             THE COURT:  Pardon.

21             MR. HEYMANN:  Do you want me to address this

22   comparison?

23             THE COURT:  What is he facing?

24             MR. HEYMANN:  He is charged with a misdemeanor.

25   The comparison, and I don't fault Mr. Farkas for this, is

1    inadequate in a number of regards.  What he produced he

2    didn't write, he obtained it from a third party.  Gonzalez

3    was actually quite, I'll use the word "irritated" because it

4    didn't function.  He also has following that event, you

5    know, at the time that he had been -- he had had a

6    substantial heroin addiction which he then kicked.  There

7    are a lot of components that go into that particular

8    charging decision that is in opposition here.

9            THE COURT:  Just a second.

10           MR. HEYMANN:  Your Honor, may I have one moment?

11           THE COURT:  Yes.  Let me stop for a moment, too.

12   The marshals want to know that even no matter what I

13   sentence Mr. Watt to he would need to be fingerprinted, but

14   the marshal's office is closing.  He could come back

15   tomorrow.  He's not going back to New York today.

16           MR. FARKAS:  We have travel arrangements, Judge.

17   Can it be done in New York?

18           THE COURT:  Let's take five minutes.

19           THE CLERK:  All rise.

20           ( A recess was taken.)

21           MR. HEYMANN:  I just wanted to clarify two points.

22   The reason I asked for a brief moment, I wanted to speak

23   with the case agent and just make sure that my memory of the

24   facts were correct.  With respect to the -- and I understand

25   that the Court has already said that the Court is simply

1    going to focus on what is in the presentence report and in

2    the exhibits, but I feel, as the Court is well aware, a

3    strong duty of candor in all matters.

4         First, the evidence we have is that there are

5    shipments of packages from the defendant to Gonzalez.  There

6    is a background going on of a lot of drugs between the

7    two.

8         THE COURT:  Yes.

9         MR. HEYMANN:  It could well be that those packages

10   contain drugs instead of money.  I don't mean, as I say this

11   to the Court, to be introducing drug dealing as part of the

12   sentencing.

13        THE COURT:  No, I understand.

14        MR. HEYMANN:  I wanted to be perfectly clear about

15   that but rather simply the facts as we have them is that

16   packages are moving contemporaneous with everything else

17   that is going on, and it could be that those contain drugs

18   instead of money.

19        The second is that to speak with precision the IP

20   addressing information from the Latvian service comes back

21   to Imagine Software, comes back to his apartment, and comes

22   back to the island area of where his mother resides.

23        We never take the final IP address information on

24   that last piece down closer than, you know, within a couple

25   miles of the house, but the inference is obviously there for

1    what.  I wanted to be clearly clear on those because I was

2    going through a lot of facts that --

3           THE COURT:  I drew you out on those facts.  I

4    understand.

5           MR. HEYMANN:  So I apologize to both you and the

6    defendant in that regard.

7           THE COURT:  No, that's okay.  Mr. Farkas, let me

8    tell you where I think you should focus.  You can say

9    whatever you would like, and I would give you equal time

10   with Mr. Heymann.

11          MR. FARKAS:  Thank you.

12          THE COURT:  As I said, I want to understand a

13   little bit about Mr. Watt's motivation, I'd also like to

14   spend some time hearing from Mr. Watt as well.  It's now a

15   question of what specific deterrence requires, what general

16   deterrence requires as well.

17          I recognize it's not an issue of rehabilitation, I

18   certainly understand that the shock to the system that this

19   case has brought about will change Mr. Watt to a degree in

20   terms of his life, he doesn't need to be trained not to do

21   this, but I'm concerned about really that quote said it all,

22   I'm concerned about people who do crimes without

23   understanding -- where they don't see the victims and,

24   therefore, convince themselves that there are no victims

25   where this becomes as some of the materials suggested, you

1  know, a blow against an impersonal corporation without

2  having any understanding that there are human beings

3  involved and what it takes to deter Mr. Watt and others from

4  doing something similar.

5  MR. FARKAS:  Obviously I've given this a lot of

6  thought, Judge, and it's almost akin to the insurance fraud

7  cases where all of a sudden about ten years ago we started

8  seeing television commercials about how insurance fraud is a

9  bad thing, so why exactly do we need television commercials

10  to tell us that a felony is a bad thing, and the reason is

11  because people didn't realize it was a bad thing or didn't

12  care.

13  So I understand where you're coming from, and that

14  quote, it's in a similar vein, and in this particular case

15  perhaps we have an advantage and a leg up on deterrence than

16  we do in other cases because of the great notariety and

17  publicity it's garnoring and the fact that what happens here

18  today and what happens with regard to every defendant is

19  going to be publicized greatly nationwide, worldwide,

20  certainly on the Internet.

21  Mr. Heymann has mentioned Wire.com's interest in

22  the case.  I've received so many calls from different media

23  organizations that there are too many to count, but there is

24  no doubt that what happens here will be scrutinized and

25  reported vastly, and in one respect I go back to what I've

stated already, and that is with regard to Mr. Watt in
particular and the harm that has been suffered by him.

This is not a situation where he has suffered some
harm and he'll be okay and it's not that big a deal, and I
think Mr. Heymann's characterization was that he will have
the same skill set and the same motivations and
opportunities to commit these crimes when he gets out, and,
quite frankly, going back to the paradox that I stated in
the very beginning between what he's arguing and the fact
that it's only a five-year cap.

He's states that he doesn't even think that the
plea here is sufficient for specific deterrence or general
deterrence. I mean, to me that's quite frankly amazing
because this is the plea that he was granted based on his
activity and now we hear it's not even enough.

I mean, that's not just right, but, in any event,
you look at let's talk about specific deterrence for a
moment, let me briefly go over the history. You know
Mr. Watt after he left college came to New York, was working
for nine dollars an hour in the construction site doing
demolition while, by the way, Gonzalez and shadow crew were
making hundreds of thousands of dollars running a black
market website, and he's making nine dollars an hour, and
they're still very, very good friends.

This is during the time he finally gets a real

1   job, and he finally gets one at Morgan Stanley where he

2   excels in the securities industry.  To there he goes to

3   Imagine Software where he's developing software for the

4   financial services industry, a very promising career which

5   he is now foreclosed from forever in one of the most

6   regulated industries in the country which is actually to

7   become even more regulated, as we know from the press.

8          It goes well beyond his future in the financial

9   services industry because now his name is plastered on every

10  search engine and every website involving computers that

11  exists, and any prospective employer that is going to

12  research him is going to know exactly what's going on in

13  this case.

14         He is radioactive, as I said, on the last date.

15  His family has suffered incredible financial harm from this

16  case.  His relationship with his wife, his psyche, as

17  described by Dr. Ebert, his mother's situation, there's so

18  many reasons to believe that Mr. Heymann's characterization

19  of why he will be just as able and willing to commit crime

20  when he gets out of prison is just not fair comment, it's

21  just not.

22         He has been incredibly devastated by what at the

23  time he felt wasn't even perhaps a crime, much less hundreds

24  of millions of people being victimized.  And you know what,

25  Judge, I think that's illustrated by the fact you do see

1    activity from his work computer and from his home

2    computer.

3            He could so easily mask his activity from his work

4    computer, from his home computer.  It would take perhaps a

5    half a second of effort, and he didn't.  This speaks the

6    casual, reckless, callous disregard he had for the real

7    enormity of what was going to result which I've argued many

8    times he didn't actually know about, and what he did know

9    about was wrong, and he should have known better, but he

10    didn't.  He needs to be punished.  I know that.

11            So with regard to specific deterrence, what his

12    experience is as a result of this arrest and conviction are

13    profound upon him, and it's just not fair comment to say

14    that he needs to go to prison for five years on top of

15    what's happened for him to not do this anymore.

16            He's got to get his life back together, Judge.  He

17    has a wife now.  He's getting older.  He's got to make a

18    living.  He can't even hold any job, and he certainly can't

19    get another job very easily without even being able to log

20    onto the Internet and look for a job.  He's prohibited from

21    using a computer at all.

22            Going back to what I was saying about the

23    widespread publicity of the case, in terms of general

24    deterrence, the audience that we are seeking to deter by

25    Mr. Watt's particular sentence will see the profound effect

1    and the simplistic nature of what he did and be deterred,

2    and even more than that, the entire conspiracy that has now

3    been brought down once they are all sentenced, we are going

4    to see a wide range of very significant prison sentences

5    throughout the whole gamut of these codefendants both here

6    and in New York and in New Jersey.

7    And these, every single one of them, as I've

8    submitted, Mr. Heymann disputes this, but as I've submitted,

9    every single one of these co-defendants was more culpable,

10   more directly involved, more malicious, more knowing than

11   Stephen Watt, and every single one of them are going to

12   prison, and if that doesn't satisfy the ends of general

13   deterrence, I don't know what does.

14   THE COURT:  Thank you.  Now I'd like to hear from

15   Mr. Watt.  Now you have a chance to speak, and I welcome

16   anything you have to say.

17   THE DEFENDANT:  Your Honor, I have chosen to read

18   the statement from paper rather than try my hand at a more

19   distinguished duration because of the events' gravity of the

20   sentencing hearing.  As a result, I hope this precaution is

21   not taken for a lack of sincerity.

22   For over a year now I've had much time to reflect

23   upon the casual and reckless manner in which I acted and the

24   way that I misguidedly overlooked the real severity of my

25   assistance as someone who at the time was my closest friend.

In this time I've also been forced to contemplate many of the issues discussed by Dr. Ebert in his report a humbling experience.  I assure you and the effect my actions have had not only upon my life and career but on the lives of those I love most and upon those I've never even met.

In the ruin that I've caused to my professional future, my mother's finances, what could have been a happy and healthy relationship with my new wife, and worst of all, the lives of regular people who certainly deserve no suffering of any kind, I know quite well the seriousness of my behavior.

This knowledge extends beyond my actions themselves to what now seems like my inexplicable belief that what I was doing was not egregious or criminal.  In addition to being able to rationalize my actions through the veil of plausible deniability and the suspension of proper ethical conduct in the face of friendship, I also gave little serious thought to my actions due to the limited time they occupied.

In hindsight, however, it is undeniable that the sniffer program which I provided to Albert Gonzalez, no matter how simple that program may have been to me, enabled Albert to accomplish of what he did.  I admit that I spent little time considering the consequences of my actions.

I also knew that Albert had money stemming in

significant proportions from elicit activities, however, I
did not foresee that he was on the verge of stealing or
making millions of dollars or causing hundreds of millions
of dollars' worth of harm to the public.

Nevertheless, I certainly have my share of
responsibility to accept in this great scheme, but I hope
that the Court will see my actions for what they were.  I
believe that I have much to offer society, and I wish to do
everything in my power to demonstrate the value that I can
add if given the chance.  This conviction and sentence can
be looked upon as either an end to a once promising
existence or a beginning to what should become a brighter
and healthier future.

I choose the latter, and I hope that you have
faith in my ability to make good on this choice.  I am
determined to show you, my family and myself that while I
may have committed criminal acts, these actions and the
resulting portrayal of me are inconsistent with my
character, and I will prove by my future actions that I am
not a criminal.  Thank you for your time.

THE COURT:  Thank you.  I think that this is a
very difficult sentencing, and as I said, it is very
difficult because if I focused on you as a man, I see
someone with a future, a supportive family making a mistake,
albeit, a substantial one.  If I focus on the nature of the

1    crime, I'm at somewhere entirely different.  It was an

2    offense that you participated in that was extraordinary in

3    its scope and sophistication.

4            It's not unusual in white collar cases that you

5    see this kind of dichotomy, but the difference is really

6    stark here.  The guidelines are not helpful because they

7    are -- I will accept the calculations, but because it

8    essentially leads to life, 43 and 1, no one, and this is

9    trumped by the mandatory minimum, the guidelines really

10   don't particularly help me very much.

11           I spent some time here trying to understand in a

12   meaningful way what, Mr. Watt, your role was, and I don't

13   hold you responsible for the entire conspiracy.  I believe

14   that your role was considerably less than the others, but I

15   can't read the communications between you and Mr. Gonzalez

16   without the sinking sense that you were saying that you were

17   helping him and saying and thinking it doesn't much matter,

18   not understanding what you were helping him do fully,

19   specifically, understanding in general but not understanding

20   specifically.

21           There's no doubt that you were less culpable than

22   all the other participants.  There's no doubt that you did

23   more than just write what seemed to be a simple program, how

24   much more I can't say, but it seems to me it's clear you had

25   a minor role.

I think the enterprise of calculating the loss here is essentially futile because we're picking numbers out of the air, beyond the number of 171,000,000 for the figure that TJX reported that it lost, beyond that, it's incalculable, and, as I said, in any event, even accepting it, it is clearly not what determines this sentence.

I'm concerned about the numbers of victims in this case. I'm concerned about the numbers of unnamed people and unknown people who were substantially hurt, and when I think of those concerns, I am where the government is in terms of a five-year sentence. When I look at you, as I said, I'm in a different situation.

I believe that your motive was not financial gain, I also believe that you did not make any money here. I think the quote in one of the papers was that, "There was a rush of a small group going after big companies. The use of computers to turn the life of a particular fellow human being into living hell feeling like a hacker from The Matrix," so that the nature of your motivation was not money but malicious even though I understand that some of that was trash talk.

I also understand that you're a first offender here and a real first offender, there's no hint of any kind of relationship to any other crime, and we know that first offenders, first offenders of all kinds in fact recidivate

1     to a lesser degree than anyone else.  So the guideline

2     sentence and even the maximum sentence is not my guidepost

3     here.

4           Looking at the factors under 3553A, in one sense I

5     don't think it takes a substantial sentence for the purpose

6     of deterring you from doing this again.  I appreciate the

7     cost to your family, I appreciate the cost to your life.  I

8     don't think that a substantial sentence is necessary to

9     deter you in particular, but I am concerned as the quote I

10     read about the culture that you reflect and that is

11     reflected in the communications, and it really is a culture

12     of impunity about the Internet.

13           The concept that it's a challenge to break into

14     computers and have an impact on substantial numbers of

15     people is a very -- it seems to me it's a culture that has

16     to stop.  I appreciate your remarks.  I understand

17     Mr. Heymann said you hadn't shown remorse.  Different people

18     show remorse in different ways.  I can't look at your

19     mother's face in the courtroom without believing that you're

20     feeling some of what her face reflects and some of her

21     remorse.

22           So the question then becomes what's the

23     appropriate sentence?  Probation is not the appropriate

24     sentence here.  It cannot be that someone who affected the

25     harm that you've affected can walk out with a probation

1  sentence.

2      Mr. Watt, would you please stand.  This is a

3  sentence that I believe will affect the purposes of

4  sentencing, it is a departure or a variance from the

5  guidelines to recognize the magnitude of this offense, to

6  protect the public in terms of general deterrence and to

7  promote respect for the law.

8      I'm going to sentence you to 24 months.  Upon your

9  release from your imprisonment, you're to be placed on

10  supervised release for three years.  When you're released,

11  you're to go to the district into which you've been

12  released.  You're to make restitution to the following

13  parties, TJX, 171.5 million, DSW, 6.5 million, BJ's

14  Wholesale Club, there's no indication, you're saying not DSW

15  and not BJ's Wholesale Club?

16      MR. FARKAS:  Well, I certainly want to be heard on

17  the issue of restitution or fines prior to you completing

18  your sentence.

19      THE COURT:  I understand.  Why don't you talk

20  about it now.  Your submission was suggesting that he was

21  not related to DSW or the BJ Wholesale Club?

22      MR. FARKAS:  Certainly we object to any

23  restitution award with regard to any entity other than TJX,

24  not that this is all that much more than a semantic

25  difference.

1          THE COURT:  I'll accept that.  I'll accept that

2     from what I've seen.  So the restitution would be 171.5

3     million.  That's joint and several with the other

4     defendants.

5          MR. FARKAS:  That is certainly something I was

6     going to ask you to clarify, Judge, but I also wanted to

7     make an application to you whether you would reconsider

8     either at this time or an adjourned date the question of

9     whether that loss figure should be part of the sentence

10    against this defendant even recognizing that $171 million

11    may be the appropriate number for TJX whether or not with

12    regard to all the factors involving a sentence and the

13    future that this person might have whether or not your Honor

14    might consider not imposing a restitution sentence.

15         THE COURT:  I don't believe there's any basis for

16    me not to impose a restitution sentence, nor do I believe

17    that there's any basis on this record to segregate what is

18    attributable to him and what is attribute to the others.

19    The best I can do is a restitution that would be joint and

20    severable with the others, the other individuals who were

21    convicted of this offense.  Payment of restitution is to

22    begin immediately, made according to the requirements of the

23    Federal Bureau of Prisons inmate financial responsibility

24    programs.  Payment shall be to the Clerk, the U.S. District

25    Court, transfer again to just TJX.  You're to notify the

U.S. Attorney within 30 days of any change of mailing or residence address that occurs when any portion of the restitution is unpaid.

No fine. While you're on supervised release, you're not to commit another federal, state or local crime. Refrain from the unlawful use of a controlled substance. Submit to one drug test within 15 days of your release and two periodic drug tests thereafter, not to exceed 104 tests per year. You're to submit to the collection of the DNA sample. You're to comply with the standard conditions. Supervised release of three years.

You are prohibited from possessing a firearm or other dangerous weapon. Again, you're to pay the balance of the restitution according to a repayment schedule that the Court would order. You're prohibited from incurring new credit charges or opening additional lines of credit without probation's approval while any financial obligations are outstanding.

You're to provide probation access to financial information which could be shared with the financial litigation unit of the U.S. Attorney's office. You're to participate in a program for substance abuse counseling again which may be you have to contribute to depending upon your ability to pay. You're to pay a special assessment of $100. I also will order self-surrender which means once you

1    are designated, you can go directly to the institution.

2    You're not remanded into custody today.

3            Let me --

4            MR. FARKAS:  I do have a couple of housekeeping

5    matters.

6            THE COURT:  I do want to hear two things, and this

7    may be ridiculous.  Actually I want to say three things.  I

8    want to say that this sentence really was imposed with the

9    benefit of both arguments.  I absolutely did not come out

10   here with a figure that I anticipated at all.  Your

11   arguments both were helpful.  All I knew was that the

12   guideline figure was appropriate and the mandatory minimum

13   was appropriate.  Beyond that I was happy to hear what you

14   had to say.

15           I'd actually like you to think about, and we'll

16   address this now, whether community service could be part of

17   supervised release, and the reason I say that is you have an

18   extraordinary skill.  I could think about using that skill

19   at the service to teach the people that I sentence day in

20   and day out who wouldn't know how to use a computer if their

21   life depended on it.  What would you recommend?

22           PROBATION OFFICER:  Your Honor, I'm not really

23   sure how that would work itself out.  If your Honor wanted

24   to impose it and we could come back to you when the time was

25   appropriate.  Mr. Watt may be supervised out of New York so

1    I'm not sure what their position would be on that.

2    Certainly if your Honor was amenable to a modification when

3    the time comes.

4           THE COURT:  All right.  I'll accept that.  Then

5    there's another provision which has been recommended which

6    is that you're prohibited from working in the computer

7    security field and from engaging an occupation that would

8    require you to access computer security systems.

9           MR. HEYMANN:  Your Honor, that was the point that

10   I was going to come to which is that the government would

11   request in light of the nature of the crime, the nature of

12   how it was committed and also the general deterrence that

13   the Court has recognized and is aiming at here that the

14   defendant be barred from owning or possessing or using

15   during the course of supervised release an Internet

16   accessible device without prior approval either of, as the

17   Court may determine, either of the Court or probation.

18          It's not intended to be -- it is intended to be a

19   bar but for a good reason to do it, which is why the out is

20   put at the end.

21          THE COURT:  I am reluctant to put as a condition

22   any prohibition of against what the defendant can or can't

23   do beyond the period of supervised release, so your

24   recommendation is during supervised release.

25          MR. HEYMANN:  I'm sorry.

1        THE COURT:  He can't own or possess a computer or

2  access the Internet without prior permission of the court or

3  probation.

4        MR. HEYMANN:  Yes, your Honor, I meant to address

5  the period of supervised release.

6        MR. FARKAS:  And your Honor, I certainly want to

7  be heard on this.  I did mention this in both of my

8  submissions.  Could Mr. Watt sit?

9        THE COURT:  Please sit down.

10        MR. FARKAS:  Okay.  HE didn't ask me that, I took

11  it upon myself.  Your Honor, we do not live, and this is the

12  most obvious statement of the day, in the year 1995.

13  Everything that we do in life today, every job search, every

14  communication virtually especially for Mr. Watt's generation

15  is reliant upon a computer.

16        If Mr. Watt wanted to get a job as a personal

17  trainer, he couldn't even, and this is he just whispered to

18  me, this actually happened, he couldn't even apply for the

19  job without a computer.  He couldn't receive e-mails from an

20  employer or from clients as to where to be, which is the

21  preferred method of communication.

22        THE COURT:  Okay.  You've persuaded me.

23        MR. FARKAS:  My specific application is that the

24  condition that's in the pretrial service order not apply.

25        THE COURT:  No, no, I appreciate that.

1    PROBATION OFFICER:  Your Honor, I have some

2 suggestions that might be helpful.

3    THE COURT:  Yes.

4    PROBATION OFFICER:  There's some opportunities to

5 install some software that is needed to monitor the

6 defendant's activity that we have in Massachusetts that I

7 assume and believe that New York has a similar type of

8 program or could come up with a program.  That may be one

9 opportunity to alleviate the concerns and then also the

10 defendant can advise anyone in the household that the

11 computer activity in the household is subject to monitoring

12 by the probation office, that he shall disclose all online

13 account information including user names or passwords to the

14 probation office, and he shall, if requested, provide a list

15 of software, hardware on the computer to monitor the

16 computer's usage and any other deemed necessary information

17 and also that he shall not subscribe to any Internet

18 providers and shall not use the services of the Internet

19 that don't have written approval by the probation office,

20 and that wouldn't make it so he can't use a computer, it

21 would just allow the probation office the ability to monitor

22 his activities.

23    THE COURT:  Mr. Farkas.

24    MR. FARKAS:  Well, your Honor, I certainly, I

25 can't reasonably object to a level of monitoring.  The whole

1   reason for post-trial supervision is to supervise, however

2   especially that last provision that we heard about will make

3   his ability to use a computer practically impossible.  Every

4   website, everywhere he wants to register with.

5         THE COURT:  What I will do is this, broadly

6   speaking, on supervised release he can't possess a firearm,

7   he can't do any other crime, that's the bottom line.  We

8   will recommend the use of a monitoring software.  He will

9   have to disclose any online accounts, any information with

10  regard to his password, his user name, if requested, and any

11  software that he's using during the period of supervised

12  release.

13        MR. FARKAS:  So to be clear, your Honor, he would

14  be required, as I think is reasonable for him, to comply

15  with requests for information, but he would not in the first

16  instance have to register or seek approval from probation?

17        THE COURT:  No, that's right.

18        MR. FARKAS:  The listing I gave was with respect

19  to information that he'd to give to probation where he's

20  being supervised, and then there would be monitoring

21  software that would be used to make certain that he's not

22  doing this again, but I accept your argument, Mr. Farkas,

23  that saying that someone can't use a computer in these days

24  is like saying you can't use a car.

25        MR. HEYMANN:  Just to complete the circle on this

1    discussion, your Honor, the monitoring software would be

2    required to be installed on any computer that he was using?

3              MR. FARKAS:  That's fine.

4              THE COURT:  Yes.

5              MR. FARKAS:  In other words, because I'm listening

6    to words very easily two years from now or less there will

7    be a conversation about this with post-trial supervision

8    that in addition to the monitoring software, Mr. Watt will

9    be able to use the computer, but he will have to respond to

10   requests from post-trial supervision.

11             THE COURT:  No, actually I think that the better

12   way, this was your recommendation, so is it better that he

13   simply right off the bat give the information concerning

14   online account user name, password, software?

15             PROBATION OFFICER:  Yes, your Honor, we would ask

16   that he be required to give that information.

17             THE COURT:  So this is not on request, he will

18   provide to the supervising office information about his

19   online accounts, his user name, his passwords and the

20   software that he's using.  I think it better to sort of do

21   that right off the bat, and, in addition, they will put

22   monitoring software on any computer that he uses.

23             MR. FARKAS:  When you say the software he's using,

24   do you mean like the web browser and the operating system or

25   do you mean like if he one day decides to download Chuck

1    Norris game on the computer?

2         THE COURT:  No, I understand.  What do you think?

3         PROBATION OFFICER:  Your Honor, I think that the

4    logistics of it can probably be worked out with the

5    supervision officer.  Our intention isn't necessarily to

6    monitor every single place that the defendant goes but to

7    ensure that we have the ability to determine whether or not

8    he's going places he shouldn't be going.

9         THE COURT:  Okay.

10        MR. FARKAS:  Well, I have no problem certainly

11   working it out when the time comes.

12        THE COURT:  Let's do that and put as directed by

13   the probation office doing the supervision, and so you'll be

14   able to work that out.

15        MR. FARKAS:  Right.  I, of course, would like to

16   reserve the right to come back to your Honor or to a proper

17   justice in whatever district he's being supervised --

18        THE COURT:  Right.

19        MR. FARKAS:  -- to discuss what's reasonable.

20        THE COURT:  You certainly, you always can.  You

21   have a right to appeal, Mr. Watt.  I do want to tell you

22   that I found this, if it's any consolation, I found this

23   incredibly difficult.

24        There is a generational divide here, and I want to

25   make sure that my reaction to this is not a product of the

1   generational divide.  I don't think it is.  I think this is

2   a product of serious, profound concerns that it can't be

3   that everyone on the computer has to learn how to encrypt

4   and encrypt and encrypt.  The people using the technology

5   have to learn what the appropriate limits are of what they

6   are doing and to understand what's a crime and what's not a

7   crime.

8           In the past you could close your door or you could

9   lock the door and you could have the guards locking your

10  information.  Now everything is online and the locks are

11  either going to come from the technology or the people, and

12  that's what this sentence is designed to do.  So, as I said,

13  you have a right to appeal, and your lawyer will let you

14  know what that consists of.  Thank you.

15          Would it be appropriate to have a self-surrender

16  date in two months?  Would that be enough time for the

17  Bureau of Prisons to recommend.

18          PROBATION OFFICER:  We recommend a four to six

19  week period so two months is fine.

20          THE COURT:  Jen, give us a date.  What that means,

21  you'll find out whether you'll be designated and then you go

22  there.

23          THE CLERK:  March 22d.

24          THE COURT:  You'll self-surrender March 22d to

25  whatever institution the Bureau of Prisons is to designate.

1    I am going to make a strong recommendation that it be in the

2    New York area.

3            MR. FARKAS:  Southern or Eastern District of

4    New York, your Honor.

5            THE COURT:  What is there?  MCC is there.  MCC is

6    not pretrial.

7            MR. FARKAS:  Quite frankly, I don't know off the

8    top of my head.

9            PROBATION OFFICER:  Your Honor, as a practice, the

10   Bureau of Prisons will try the best to place as close to

11   their home as possible.  It's helpful to have the

12   recommendation, but they will put him as close to New York

13   as they can.

14           THE COURT:  We'll do that.  As I said, Mr. Farkas,

15   I will write this up.  I will write a decision on this which

16   will issue hopefully before the judgment is signed.  Thank

17   you.

18           MR. FARKAS:  Thank you, your Honor.

19           THE CLERK:  All rise.

20           (A recess was taken.)

21           THE COURT:  Would it be appropriate to have a

22   self-surrender date in two months?  Would that be enough

23   time for the Bureau of Prisons to recommend.

24           PROBATION OFFICER:  We recommend a four- to

25   six-week period, so two months is fine.

1        THE COURT:  Jen, give us a date.  What that means,

2    you'll find out whether you'll be designated and then you go

3    there.

4        THE CLERK:  March 22d.

5        THE COURT:  You'll self-surrender March 22d to

6    whatever institution the Bureau of Prisons is to designate.

7    I am going to make a strong recommendation that it be in the

8    New York area.

9        MR. FARKAS:  Southern or Eastern District of

10   New York, your Honor.

11       THE COURT:  What is there?  MCC is there.  MCC is

12   not pretrial.

13       MR. FARKAS:  Quite frankly, I don't know off the

14   top of my head.

15       PROBATION OFFICER:  Your Honor, as a practice, the

16   Bureau of Prisons will try their best to place as close to

17   their home as possible.  It's helpful to have the

18   recommendation, but they will put him as close to New York

19   as they can.

20       THE COURT:  We'll do that.  As I said, Mr. Farkas,

21   I will write this up.  I will write a decision on this which

22   will issue hopefully before the judgment is signed.  Thank

23   you.

24       MR. FARKAS:  Thank you, your Honor.

25                          - - - -

1          (Whereupon, the hearing was suspended at

2     6:00 p.m.)

3

4              C E R T I F I C A T E

5

6     UNITED STATES DISTRICT COURT )

7     DISTRICT OF MASSACHUSETTS     )

8     CITY OF BOSTON                )

9          I, Valerie A. O'Hara, Registered Professional

10    Reporter, do hereby certify that the foregoing transcript

11    was recorded by me stenographically at the time and place

12    aforesaid in No. 08-10318-NG, United States vs. Stephen Watt

13    and thereafter by me reduced to typewriting and is a true

14    and accurate record of the proceedings.

15                        /S/ VALERIE A. O'HARA

16                        _____

                          VALERIE A. O'HARA

17                        REGISTERED PROFESSIONAL REPORTER

18                        DATED JANUARY 29, 2010

19

20

21

22

23

24

25